(PRIZE.)

The LONDON PACKET.—*Merino*, Claimant.

A question of proprietary interest on farther proof. Restitution decreed, with costs and expenses to be paid by the claimant.
In general, the circumstance of goods being found on board an enemy's ship raises a legal presumption that they are enemy's property.

THIS was the claim of a Spanish subject, to a parcel of hides laden on board of the London Packet, a British ship, at the port of Buenos Ayres, in South America, in the month of June, 1813. The London Packet, on her voyage to London, was captured by the private armed brig the Argus, and carried

into Boston for adjudication. On being libelled in the

District Court as prize of war, the consul of his Catholic Majesty filed a claim for the property in question in favour of Don Jeronimo Merino, a Spanish subject. The District Court condemned the vessel and the whole of the cargo, except these hides, which were restored to the claimant, the Court being satisfied there was not such proof of enemy's property therein, as to authorize a decree of condemnation. For the ship and residue of the cargo no claim was interposed. From this decree, as to the hides, there was an appeal by the captors to the Circuit Court, where the same was reversed. The Court, although it reversed the sentence which had been pronounced below, expressed its entire satisfaction as to the national character and domicil of the claimant, and that the hides had been originally shipped by him; but condemned the property, because, on the order for farther proof, no affidavit had been offered, either of the claimant or his confidential agent, or clerk, of his interest in the cargo at the time of the shipment. It was considered, that the absence of such a document, so universally expected and required by prize tribunals, unavoidably threw a suspicion over the cause, and being wholly unaccounted for, it authorized a belief that there had been a voluntary, if not a studied omission on the claimant's part. At the same term in which the sentence of reversal was pronounced, but not until after such sentence was known, the affidavit of the claimant, which had been received since the last adjournment of the Court, was produced by the Spanish Consul, with a petition

that the decree might be rescinded, for the purpose of admitting it into the case, or that the same might be so far opened, for the consideration of the Court, as to make the affidavit of Merino a part of the evidence therein, so as to accompany the other testimony in the appeal to this Court. Upon this application the Circuit Court ordered, that the affidavit should be received by the clerk, and sent up with the other papers *de bene esse,* subject to the directions of this Court. The affidavit had been taken on an order below for farther proof, but had not been received, as has been stated, when the decree of condemnation was pronounced.[a]

Mr. *Webster* and Mr. *Pitman,* for the captors, argued, that it was a well-settled principle in the Prize Court, that the *onus probandi,* lies on the claimant. "In the Prize Court," says Sir Wm. Scott, "where special reasons for deception are perpetually occurring, and where the Court exercises a much more unconfined jurisdiction on questions of property than it exercises in its civil forum, proof of property lies generally on the claimant, and he may be called upon to support the *prima facie* evidence of a good title which is already exhibited."[b] This burden would have rested on the claimant in the present case if the goods in question had been found on board of a *neutral* ship; but it is increased by the fact that the property was found on board an *enemy's* ship, and an enemy's

---

a  *Vide* S. C. 1 *Mason's Rep.* 14.  *Ante, vol.* II. 371.
b  The Countess of Lauderdale, 4 *Rob.* 234.

armed ship. The maxim as laid down by Grotius, is: " *Res hostium navibus presumuntur esse hostium, donec contrarium probetur.*" A presumption which, nevertheless, may be destroyed by *strong proofs* to the contrary.[a] In this case, the property was not only found on board an enemy's armed ship, but was unaccompanied by the documentary evidence required to prove its neutrality. No papers were found at the time of capture relating to the cargo, except the bills of lading; and all the letters and invoices were sunk by the order of the master of the London Packet, in the letter bag, as sworn by two of the crew upon their examination on the standing interrogatories. The spoliation of papers, is, therefore, superadded to the fact of the property being found on board a ship of the enemy, destined to an enemy's port; and the claimant is called upon to produce the strongest, and most satisfactory proof to destroy the many presumptions arising from these facts, that, in truth, the property belongs to the enemy. The claimant has had abundant opportunity afforded him to produce this proof. The first order for further proof was made in the District Court the 26th of November, 1813, and the claimant was indulged until nearly the close of the year 1815, in the Courts below, to establish the verity of his claim. Having failed so to do, this Court afforded him further time, and he has had from February, 1816, until this term, a period of four years, to produce plenary proof in

---

a *De Jure Belli ac Pac. b. 3. c. 6. s. 6.    Bynk. Q. J. Pub. l. 1. c. 13. Loccenius, l. 2. c. 4. n. 11.*

reference to a claim so much indulged, and surround-
ed with so many circumstances of suspicion.   If the
claimant has failed to produce this proof, the pre-
sumption is irresistible, that his claim must be false.
In such a suspicious case too, something more is to
be expected from the claimant himself, than a mere
test affidavit,[a] which is all the evidence (coming from
himself) which the claimant has yet furnished.

  Mr. *D. B. Ogden* and Mr. *Winder*, contra, ad-
mitted the rule of the Prize Court, that property
found on board an enemy's vessel is presumed to be
enemy's property: but, for this very reason, they
insisted, such a vessel would seldom be made the
vehicle of enemy's property intended to be covered
as neutral.  The records of the Court would show
that in a great majority of the cases, where attempts
have been made to disguise enemy's property, such
attempts have been made by lading the goods on
board a neutral vessel, in order to avoid that suspi-
cion on which the rule of law is founded.   But in
this case, the presumption itself can have but little
weight; because it appears in evidence that the
claimant was compelled, by necessity, to lade his
goods on board an enemy's vessel, there being, at
that time none but British ships, at Buenos Ayres,
destined for Europe, for which market his goods
were intended.   Some indulgence is due to the sub-
jects of neutral States, who not having sufficient
shipping of their own to carry on their trade, are
compelled to resort to the navigation of other coun-

a The Magnus, 1 *Rob.* 31.

tries, which may happen to be belligerent. Nor can

the circumstance of a spoliation of papers by the enemy master have any unfavourable effect upon the claim of a neutral shipper conducting *bona fide*.[a] Even the actual resistance of the enemy master will not preclude the neutral shipper from receiving restitution, unless he participates in such resistance, and thus forfeits the privileges of his neutral character.[b] The counsel on both sides also argued upon the facts, with great minuteness and ability.

Mr. Justice LIVINGSTON delivered the opinion of *Feb. 20th.* the Court. In the argument of this cause, the counsel have not confined themselves to the effect which the affidavit of the claimant ought of itself to have upon the decision of it, but have animadverted on all the testimony below. The Court has, therefore, also extended its examination to all the proofs in the cause, and will now pronounce its judgment on them.

The captured vessel was confessedly British property, as well as a great part of its cargo, and its destination was to a port in the enemy's country, which raises a legal presumption, that the property claimed was not neutral. It is not denied, that a neutral may use the vessel of a belligerent, for the transportation of his goods, and whatever presumption may arise from the circumstance, that it is not of itself a cause of condemnation. In this case, it does not appear, nor was it probably the fact, that any neutral vessel

*Presumption arising from the fact of the goods being found on board an enemy's vessel.*

a The Friendschaft, 3 *Wheat.* 14. 48.
b The Nereide, 9 *Cranch*, 388. 423.

bound to London, was then at Buenos Ayres, and, therefore, this presumption ought to have but little influence on the present decision. If the proprietary interest be satisfactorily made out, the claimant is entitled to restitution.

There was no letter found on board from Merino to his correspondent in London, nor any invoice of this property. The only document relating to it was a bill of lading in Spanish, dated the 19th of June, 1813, purporting that 6,276 hides had been shipped on board the London Packet, by Jeronimo Merino, on his account and risk, to be delivered to Antonio Daubana, or in his absence to William Heiland, they paying the freight therein stipulated. This bill of lading was not signed by the master. To the omission of a signature to this bill of lading, much importance cannot be attached. It was found in possession of the master, and serving only as a memorandum for him of the cargo on board; and not being intended to pass into the hands of any other persons, it was a matter of indifference whether he put his name to it, or not. Of seven bills of lading which were found on board, no less than three were without his signature. Those which were delivered to the shippers, were, no doubt, signed, which was all that was necessary for their security. If this bill of lading be compared with the one produced, and proved by Daubana, it is impossible not to be struck with the exact similarity between them. They correspond in all respects, excepting only that one has not the signature of the captain, and appears most manifestly to have been filled up with the same ink, and in the

same hand-writing, and at the same time; which is no small proof of their being cotemporaneous acts, and of the authenticity of the one which is now produced by the consignee. But no letter from Merino to his correspondent, nor any invoice, nor any bill of lading for the consignee, being found on board, it is urged, that the proof of proprietary interest is defective, and that the sentence of condemnation ought, therefore, to be affirmed. Had no farther proof been introduced, relieving the case from this difficulty, the argument would be entitled to great consideration. But the absence of those papers is now accounted for. It appears by the testimony of Stephenson, a passenger on board the London Packet, who was examined by the captors, that a large bag, containing a great number of private letters, and other papers, was sunk by order of the master of the London Packet, about half an hour before his vessel was taken. It is then but a fair presumption, that the letter, invoice, and bill of lading transmitted by Merino to his correspondent in London, were among the papers thus destroyed. The loss of these papers being thus accounted for, and the master of the captured ship not being brought in as he ought to have been, there was a propriety under the peculiar circumstances of this case, in affording, as the Court below did, an opportunity to the Spanish owner, of offering subsidiary proof respecting the property mentioned in the bill of lading found on board, and which was claimed by him. This farther proof, which consists of documents from the custom house at Buenos Ayres, of the positive testi-

mony of Mr. Daubana, the consignee in London, and of the test-affidavit of Mr. Merino himself, is satisfactory, that the proprietary interest of these hides was, at the time of shipment and of capture, in the claimant. That they belonged to Smith notwithstanding the mark of S. on some of them, as has been suggested, cannot be believed. On that supposition, his conduct is utterly inexplicable. If the adventure was on his account, the disguise of the shipment could have been intended for no other purpose than to impose, as to them, on the Courts of the United States; for this contrivance or cover could not protect his vessel from capture and condemnation. Yet, if we believe some of the witnesses, Smith declared, that the whole of the cargo belonged to himself, and some merchants in London. These declarations of Smith, as he was set at liberty by the captain of the Argus, and, of course, not examined on the standing interrogatories, ought not to militate against the integrity of the present claim; but if they were really made, they afford strong evidence, that if this bill of lading were designed as a cover for belligerent property, some other person, and not Smith, was to be benefitted by it. For if he were the real owner, why, it may be asked, did he voluntarily abandon the property, (for he was put on board of another vessel, at his own request,) at the very moment when this fraud, if he ever intended to avail himself of it, was to be consummated? Why did he not remain in his vessel until her arrival in the United States, and apply to a Spanish Consul, or some other gentleman, to prefer a claim in favour of

the pretended Spanish owner? Why did he not sup-
port this claim with his own oath, as he must have in-
tended to do if he ever intended to derive any advan-
tage from a contrivance which must have had its
inception at Buenos Ayres, at his instigation, and
for his emolument? There is no accounting for his
conduct on any ether hypothesis, than that he had no
interest in this property, and was, therefore, willing
to leave it to its fate.

The counsel for the captors, aware of the full and
conclusive nature of the proof, so far as it establishes
Merino's interest in the merchandize claimed by
him, have endeavoured to show that Merino was not
at Buenos Ayres when this shipment took place, and
if he was, that it is impossible that his letter, which
bears date the 10th of July, 1813, could have been
put on board of the London Packet, which had sailed
on the 24th of June, fourteen days before. If this
be so, a gross attempt has been made to impose on
the Court, which ought to be followed with conse-
quences fatal to the present claim. But the Court
is not of opinion that either of these suppositions is
supported by the evidence. Not a single witness
whose testimony is relied on to establish the fact of
Merino's not being at Buenos Ayres at the time of
the shipment, speaks with any certainty, or tells us
affirmatively where he then was. This negative tes-
timony, which, if it stood alone and uncontradicted,
might excite a strong suspicion, is rendered of very
little consequence, by much proof of a contrary cha-
racter. The custom house document which has
already been referred to, establishes the residence of

Merino at Buenos Ayres at the date of the shipment;
so does the affidavit of Merino himself, who is proved
to be a gentleman of character, of property, and re-
spectability. Daubana also swears to the same fact,
with as much certainty as one correspondent can
establish the domicil of another residing at so great
a distance from each other.  He proves that Merino
remained there until the 15th of August following,
at least, that he received a letter from him, dated at
Buenos Ayres, on that day.  Another witness, who
saw him at Rio Janeiro in the year 1814, says, that
he did not leave Buenos Ayres until after the middle
of the year 1813.  The weight of testimony, there-
fore, may be considered as in favour of the claimant
being at Buenos Ayres when this shipment was
made.  Nor is it so certain, as seemed to be taken for
granted at the bar, that the London Packet sailed on
her voyage for Europe on the 24th of June, 1813.
It is true, that the cook, and some others who were
examined *in preparatorio*, fix the time of her de-
parture to that day ; but the second mate, and only
officer of the captured vessel who was examined, and
who was most likely to know, says that she sailed
in the month of July.  Under this uncertainty re-
specting a fact which is deemed so material, and to
which the claimant's attention has never been called,
it cannot be expected that the Court should not only
act upon it, as positively proved, but follow it up
with the condemnation of property so clearly proved
to belong to a neutral.  It would be more charitable,
and not unreasonable, even if the fact were proved,
to presume that witnesses were speaking of the time

of the London Packet's first weighing anchor at Buenos Ayres, and that she may for some reason or other have been detained in the river until the 10th of July, which is the date of Merino's first letter to his correspondent in London. It may be added, that it is not easy to believe, that if a fraud were intended, care would not have been taken to make the letter of advice, and all the other papers, correspond with the time of the departure of the vessel.

Upon the whole, a majority of the judges are of opinion, that upon the farther proof the sentence of the Circuit Court should be reversed, and the property restored to the claimant. But as the captors have been put to great expense in consequence of the imperfect documents found on board, and the great delay which has attended the production of the farther proof, they are of opinion that their costs and expenses must be paid by the claimant.

Restitution,
with costs and
expenses to be
paid by the
claimant.

Decree reversed.

DECREE.—This cause came on to be heard on the transcript of the record of the Circuit Court of the United States for the District of Massachusetts, and the farther proof exhibited in this cause, and was argued by counsel. On consideration whereof, it is DECREED and ORDERED, that the Decree of the Circuit Court for the District of Massachusetts in this case, condemning six thousand two hundred and seventy-six ox hides, as good and lawful prize to the libellants, be and the same is hereby reversed and annulled. And this Court, proceeding to pass such

Decree as the said Circuit Court should have passed, it is further DECREED and ORDERED, that the said six thousand two hundred and seventy-six ox hides, be restored to the claimant: And it is further DECREED, that the said Claimant pay to the Libellants the costs and expenses incurred in the prosecution of this suit.