## THE CARLOS F. ROSES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF FLORIDA.

No. 243. Argued January 12, 1900.—Decided May 14, 1900.

The Carlos F. Roses, a Spanish vessel, owned at Barcelona, Spain, sailed from that port for Montevideo, Uraguay, with a cargo which was discharged there and a cargo of jerked beef and garlic taken on board for Havana, for which she sailed March 16, 1898. On May 17, while proceeding to Havana, she was captured by a vessel of the United States and sent to Key West, where she was libelled. A British company doing business in London, laid claim to the cargo on the ground that they had advanced money for its purchase to a citizen of Montevideo, and had received bills of lading covering the shipments. The vessel was condemned as enemy's property, but the proceeds of the cargo, which had been ordered to be sold as perishable property, was ordered to be paid to the claimants. *Held,*

(1) That as the vessel was an enemy vessel, the presumption was that the cargo was enemy's property, and this could only be overcome by clear and positive evidence to the contrary ;

(2) That on the face of the papers given in evidence, it must be presumed

that when these goods were delivered to the vessel, they became the property of the consignors named in the invoices;

(3) That the British company got the legal title to the goods and the right of possession only if such were the intention of the parties, and that that intention was open to explanation, although the persons holding the papers might have innocently paid value for them;

(4) That in prize courts it is necessary for the claimants to show the absence of anything to impeach the transaction, and at least to disclose fully all the surrounding circumstances, and that the claimants had failed to do so ;

(5) That the right of capture acts on the proprietary interest of the thing captured at the time of the capture, and is not affected by the secret liens or private engagements of the parties;

(6) That in this case the belligerent right overrides the neutral claim, which must be regarded merely as a debt and the assignment as a cover to an enemy interest.

THE Carlos F. Roses was a Spanish bark of 499 tons, hailing from Barcelona, Spain, sailing under the Spanish flag, and officered and manned by Spaniards. She had been owned for many years by Pedro Roses Valenti, a citizen of Barcelona. Her last voyage began at Barcelona, whence she proceeded to Montevideo, Uruguay, with a cargo of wine and salt. All of the outward cargo was discharged at Montevideo, where the vessel took on a cargo consisting of jerked beef and garlic to be delivered at Havana, Cuba, and sailed for the latter port on March 16, 1898. On May 17, when in the Bahama Channel off Punta de Maternillos, Cuba, and on her course to Havana, she was captured by the United States cruiser New York and sent to Key West in charge of a prize crew. The bark and her cargo were duly libelled May 20. All of the ship's papers were delivered to the prize commissioners, and the deposition of Maristany, her master, was taken *in preparatorio*. Kleinwort Sons and Company of London, England, made claim to the cargo, consisting of a shipment of 110,256 kilos of jerked beef and 19,980 strings of garlic, and a further shipment of 165,384 kilos of jerked beef, alleging that they were its owners and that it was not lawful prize of war. In support of the claim the firm's agent in the United States filed a test affidavit made on information and belief. In this it was alleged that

Kleinwort Sons and Company were merchants in London; that the members of the firm were subjects of the United Kingdom of Great Britain and Ireland; that in February and March, 1898, the bark, being then in Montevideo, bound on a voyage to Havana, took on board a cargo of jerked beef and strings of garlic shipped by Pla Gibernau and Company, merchants of Montevideo, to be transported to the port of Havana, and there to be delivered to the order of the shippers according to the condition of certain bills of lading issued therefor by the bark to Pla Gibernau and Company; that the members of the firm of Gibernau and Company were citizens of the Argentine Republic; that the bark left Montevideo on March 16, and proceeded on her voyage to Havana, until May 17, when, being at a point in the Bahama Channel off Martinique, she was captured by the United States cruiser New York, without resistance on her part, and sent into Key West as prize of war. That after the shipment of the cargo in Montevideo claimants made advances to the shippers and owners of the cargo in the sum of £6297, British sterling, to wit, £2714 item thereof, upon the security of said lot of 110,256 kilos of jerked beef and 19,980 strings of garlic, and £3583 item thereof, upon the security of said lot of 165,384 kilos of jerked beef; that at the time of making said advances and in consideration thereof, bills of lading covering the shipments were delivered to claimants duly indorsed in blank with the intent and purpose that they should thereby take title to said bills of lading, and to said shipments of jerked beef and garlic, and should, on the arrival of the vessel at her destination, take delivery of the shipments and hold the same as security for their said advances until paid, and with the right to dispose of said shipments and to apply the proceeds to the payment of their said advances; and accordingly the said Kleinwort Sons and Company did become and ever since have been and still are as aforesaid the true and lawful owners of the said bills of lading and of the shipments of jerked beef and garlic therein referred to. The affidavits further stated that the advances were equivalent in money of the United States to about $30,644.35, and that no part of the same had been paid, or otherwise secured to be paid.

The cause was heard on the libel and claims of the master of the bark and Kleinwort and Company, and the evidence taken *in preparatorio.* The vessel was condemned as enemy property, and the court ordered the claimants of the cargo to "have sixty days in which to file further proof of ownership;" and because of its perishable nature the marshal of the court was ordered to advertise and sell the same, and deposit the proceeds in accordance to law. No appeal was taken on behalf of the vessel. The cargo was sold and the proceeds deposited with the assistant treasurer of the United States at New York, subject to the order of the court. The time for claimants to take further proofs was twice extended. No witnesses were produced by claimants, but Charles F. Harcke, claimants' manager in London, made three *ex parte* affidavits before the United States consul general, which were offered in evidence by claimants. Appended to the affidavits were a large number of exhibits purporting to be papers, or copies of papers, relating to the shipment of the cargo, and some of the financial transactions of some of those who had to do with it. From these affidavits and papers it appeared that the voyage of the Carlos F. Roses was a joint venture entered into by Pedro Pagés of Havana, a Spanish subject; the Spanish owners of the vessel, and Gibernau and Company. The whole cargo was made up of two shipments, one of jerked beef and one of garlic, which had been purchased by Gibernau and Company on commission, and by them delivered to the Carlos F. Roses "consigned to order for account and risk and by order of the parties noted" in the invoices. The shipment of jerked beef containing 275,640 kilos in bulk was divided thus: 60 %, 165,384 kilos, "to the expedition or voyage of the Carlos F. Roses;" 40 %, 110,256 kilos, "to Mr. Pedro Pagés of Havana." The shipment of garlic was divided thus: 9990 strings, "account of Mr. Pedro Pagés," and 9990 strings for "account of" Gibernau and Company. Both invoices were signed by Gibernau and Company, and bore date March 11 and 12, 1898.

Harcke stated in one of his affidavits that: "The said cargo was ultimately destined for Don Pedro Pagés, of Havana, who in the ordinary course of business would by payment to or in-

demnification of Kleinwort· Sons & Co. or their agents in that behalf take up the said bills of lading and thus be enabled thereon to take the goods. No payment whatever has been made to Messieurs Kleinwort Sons & Co., or their agents, on account of the payments made by them through the said advances by said Don Pedro Pagés, or by any person on his behalf, or otherwise, and the said Kleinwort Sons & Co. have been and are wholly unindemnified in respect of their said payments except so far as the proceeds of the said cargo and the insurance thereon which as the owners of the said goods they have become entitled to collect, thereby subrogating to their own right to the extent of such payments the insurers of the said goods."

The ship's manifest appears to have been signed by Maristany, her master, at Montevideo, on March 15, 1898, and was *viséd* by the Spanish consul at that port the previous day. It described the ship's destination as Havana, and her cargo as made up of two lots of jerked beef containing 248,076 kilos and 29,970 kilos respectively, and one lot of garlic containing 19,980 strings, all shipped by Gibernau and Company, "to order." On March 14, Maristany issued three bills of lading, in which it was stated that the shipments were received from Gibernau and Company for transportation to Havana "for account and at the risk of whom it may concern;" one of the bills covering a shipment of 165,384 kilos of jerked beef; another of 110,256 kilos of jerked beef; and the third of 19,980 bunches of garlic.

March 15, Gibernau and Company drew this bill of exchange:

"No. 128. Montevideo, March 15, 1898. For £2714 13 8. Ninety days after sight you will please pay for this first of exchange (the second and third being unpaid), to the order of the London River Plate Bank, L'd, the sum of £2714 13 8, value received, which you will charge to the account of Pedro Pagés of Havana as per advice.

"Pla Gibernau & Co.

"To Messrs. Kleinwort Sons & Co., London." ·

On the same day Maristany drew this bill of exchange:

"No. 129. Montevideo, March 15, 1898. For £3583 11 6.

Ninety days after sight you will please pay for this first of exchange (the second and third being unpaid), to the order of Pla Gibernau & Co. the sum of £3583 11 6, invoice value of jerked beef, per Carlos F. Roses, which you will charge to the account of P. Roses Valenti, of Barcelona, as per advice.

" YSIDRO BERTRAN MARISTANY.

" To Messrs. Kleinwort Sons & Co., London."

This was indorsed by Gibernau and Company.

Valenti was the managing owner of the Carlos F. Roses. Both bills of exchange passed through the London River Plate Bank, L't'd, at Montevideo. On April 6 they were accepted by Kleinwort Sons and Company, and on May 9 were paid under discount by that firm. Harcke alleged that at the time of the acceptance of these bills of exchange, bills of lading covering the shipments of the garlic, and the jerked beef shipped for account and by order of Pagés, indorsed in blank by Gibernau and Company, were delivered to claimants, as security for the payment of the bills of exchange; and that thereafter the bill of lading covering the shipment of jerked beef made for the account and by the order of the Carlos F. Roses was delivered in like manner, but affiant did not state when. It was also alleged that on April 9 the bills of lading and invoices, covering the shipment of garlic and Pagés's share of the jerked beef were mailed by Kleinwort Sons and Company to Gelak and Company, bankers of Havana, to be held until the bills of exchange charged to the account of Pagés should be paid. Neither the instructions sent to Gelak and Company, nor a copy of them, were produced. Harcke further alleged that the bills of lading and the invoices covering the vessel's share of the shipment of jerked beef were retained by Kleinwort Sons and Company " pending the disposal of the said cargo." On May 17, the day of the capture, Kleinwort Sons and Company cabled Gelak and Company requesting them to return the bills of lading and invoices, which had been forwarded on April 9. June 9, Gelak and Company replied that the bills and invoices had not been received. On October 21 claimants produced these bills of lading, alleging that they had been received from Gelak and

Company on October 18, and that neither Pagés, Gibernau and Company, nor the owners of the Carlos F. Roses had paid claimants anything for or on account of their acceptance and payment of the bills of exchange. The cause of the cargo was heard a second time on the claim, test affidavit, and Harcke's affidavits, and a decree was entered for the payment to claimants of the proceeds of sale; from which decree the United States took this appeal.

*Mr. James H. Hayden* and *Mr. Assistant Attorney General Hoyt* for the United States. *Mr. Joseph K. McCammon* was on their brief.

*Mr. Wilhelmus Mynderse* for the claimants.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The President's proclamation of April 26, 1898, declared the policy of the government in the conduct of the war would be to adhere to the rules of the Declaration of Paris therein set forth, one of them being thus expressed: " Neutral goods, not contraband of war, are not liable to confiscation under the enemy's flag."

The question is whether this cargo when captured was enemy property or not. The District Court held that both the title and right of possession were in these neutral claimants at the time of the capture, " as evidenced by the indorsed bills of lading and the paid bills of exchange," and, therefore, entered the decree in claimant's favor. As the vessel was an enemy vessel the presumption was that the cargo was enemy's property, and this could only be overcome by clear and positive evidence to the contrary. The burden of proving ownership rested on claimants. *The London Packet*, 5 Wheat. 132; *The Sally Magee*, 3 Wall. 451; *The Benito Estenger*, 176 U. S. 568.

Further proofs on claimant's behalf were ordered to be furnished within sixty days from June 2; and the time was enlarged to August 31; and again to October 15. The proofs

tendered were three affidavits of claimants' manager sworn to September 27, October 12 and October 21, 1898, respectively, with accompanying papers. Such *ex parte* statements, where further proofs have been ordered, though admitted without objection, are obviously open to criticism, but without pausing to comment on these in that aspect, we inquire whether they satisfy the requirements of the law of prize in respect of the establishment of the neutral character of this cargo under the circumstances.

Gibernau and Company were citizens of a neutral state; they were evidently commission merchants, and in each invoice a charge for their commission on the shipment appears. The invoices expressly provided that the goods were shipped " to order for account and risk and by order of the parties noted below." The consignees noted below in the invoice of the jerked beef were the owners of the vessel, " the expedition or voyage of the 'Carlos F. Roses'" and " Mr. Pedro Pagés of Havana," all Spanish subjects. The consignees of the garlic were " Mr. Pedro Pagés " and " the undersigned'; " that is, Gibernau and Company. There were three sets of bills of lading issued by the master to Gibernau and Company. One covered the portion of the shipment of jerked beef made for the account of the vessel; another, the portion of that shipment made for the account of Pagés; the third, the shipment of garlic made for the joint account of Pagés and Gibernau and Company. All the bills set forth that the goods were taken for the account and at the risk of whom it might concern. The ship's manifest was signed under date March 15, and the destination of the cargo was stated thus : " Shipped by Pla Gibernau Co. To order." The *visé* of the consul of Spain, dated the day before, was : " Good for Havana, with a cargo of jerked beef and garlic." As the vessel had a share in the shipment of the jerked beef, and the consignees were named in the invoices, which set forth that the shipments were made by their orders for their account and at their risk, it would appear that the manifest was erroneous, and this and the fact that the bills of lading stated that the goods were taken " for account of whom it may concern," should be especially noted, since the reasonable inference is

that the consignees must have been known to the master. And it also should be observed that there was no charter party, which would have necessarily revealed the engagements of the vessel, but which naturally would not be entered into if the commercial venture was that of her owner. The general rule is that a consignor on delivering goods ordered, to a master of a ship, delivers them to him as the agent of the consignee so that the property in them is vested in the latter from the moment of such delivery, though the rule may be departed from by agreement or by a particular trade custom, whereby the goods are shipped as belonging to the consignor and on his account and risk. We think that on the face of the papers it must be concluded that when these goods were delivered to the vessel they became the property of the consignees named in the invoices. Hence the shipments of jerked beef must be regarded as owned by Pagés, or by him and the owners of the Carlos F. Roses. One half of the garlic belonged to Pagés, the remaining half was consigned to Gibernau and Company, and they did not claim, and have not claimed it, nor was it asserted that Gibernau and Company retained the ownership of any part of the cargo after its delivery to the vessel. Property so long unclaimed may be treated as in any view good prize. *The Adeline*, 9 Cranch, 244; *The Harrison*, 1 Wheat. 298. In fact, claimants admit that the whole cargo " was ultimately destined for Don Pedro Pagés of Havana." The bill of exchange drawn by Gibernau and Company named Kleinwort Sons and Company as acceptors, and directed them to charge the amount to the account of " Pedro Pagés of Havana as per advice." The bill drawn by Maristany also named Kleinwort Sons and Company as drawees, and directed them to charge the amount " to P. Roses Valenti of Barcelona as per advice." In neither of them was there any reference to the cargo, and, so far as appeared, the amounts were at once charged up to the persons named.

Harcke said that when the bills of exchange were accepted by Kleinwort Sons and Company bills of lading covering the shipment of 110,256 kilos of jerked beef and of the garlic were delivered to them in consideration of the acceptance of the

draft for £2714 13 8, and that bills of lading for the 165,354 kilos of jerked beef were afterwards delivered in consideration of the acceptance of the draft for £3583 11 6. But the date of the latter delivery was not given, and it affirmatively appeared that whenever these bills of lading reached Kleinwort Sons and Company they were retained "pending the disposal of the cargo." Both drafts were accepted April 6, and the bills of lading for the 110,256 kilos of jerked beef and for the garlic were forwarded to Gelak and Company on April 9, but the bills for the 165,384 kilos of jerked beef, whenever received, never were. The instructions to Gelak and Company were not put in evidence, nor any of the correspondence with Valenti or Pagés. In June, Gelak and Company cabled that the bills sent to them had not been received; in September they turned up, but no information was afforded as to how they came into Gelak and Company's possession; and in October duplicates were also received by claimants from Gelak and Company, with, so far as disclosed, no accompanying explanation. And Harcke's affidavits failed to set forth the relations, transactions or correspondence existing and passing between claimants and the enemy owners of the cargo. This, although, as Sir William Scott said in *The Magnus*, 1 C. Rob. 31, "the correspondence of the parties, the orders for purchase, and the mode of payment, would have been the points to which the court would have looked for satisfaction."

The affidavits alleged that claimants were wholly unindemnified except by the proceeds of the cargo and the insurance thereon, by which the insurers were subrogated to their own rights, but did not state whether the insurance contemplated a war risk, or why the bills of lading for the larger portion of the beef were retained by claimants and not sent to their Havana agents, or whether they retained them upon instructions from the enemy owners; or whether they came to claimants from Spain; nor did anything appear in respect of the interest of Pagés as consignee for himself, or in a representative capacity; nor of Valenti, the owner of the enemy vessel, who resided at Barcelona. The evidence of enemy interest arising on the face of the documents called on the asserted neutral owners to prove

beyond question their right and title. And still for all that appears, the documents may have been sent merely to facilitate delivery to the agent of the enemy owners.

Bills of lading stand as the substitute and representative of the goods described therein, and while *quasi* negotiable instruments, are not negotiable in the full sense in which that term is applied to bills and notes. The transfer of the bill passes to the transferee the transferror's title to the goods described, and the presumption as to ownership arising from the bill may be explained or rebutted by other evidence showing where the real ownership lies. A pledgee to whom a bill of lading is given as security gets the legal title to the goods and the right of possession only if such is the intention of the parties, and that intention is open to explanation. Inquiry into the transaction in which the bill originated is not precluded because it came into the hands of persons who may have innocently paid value for it. *Pollard* v. *Vinton,* 105 U. S. 7; *Shaw* v. *Railroad Company,* 101 U. S. 557.

Generally speaking, in the purchase and shipment of goods on bills of lading attached to bills of exchange drawn against them, the bill of exchange is drawn on the consignee and purchaser, and sent forward for collection through the banker at the place of shipment, who advances on the draft, and thereafter realizes on it through his correspondents, or by sale as exchange; or the banker at some other point, or at the general exchange center, may be the drawee of the bill of exchange instead of the consignee or real owner, the banker standing in the place of the owner, in virtue of some arrangement with his customer, or on the faith of a running account, the pledge of other securities, or the customer's personal liability, so that the draft may be charged up at once, and, at all events, the control of the goods is not the sole reliance of the banker.

In the case in hand, the captors succeeded to the enemy owners' rights, and could have introduced evidence as to the real nature of the transactions, and so have rebutted any presumption in favor of the bankers as purchasers for value, and although they did not do this, the question still remains that in prize courts it is necessary for claimants to show the absence of any-

thing to impeach the transaction, and at least to disclose fully all the surrounding circumstances. And this we think claimants have failed to do.

The right of capture acts on the proprietary interest of the thing captured at the time of the capture and is not affected by the secret liens or private engagements of the parties. Hence the prize courts have rejected in its favor the lien of bottomry bonds, of mortgages, for supplies, and of bills of lading. The assignment of bills of lading transfers the *jus ad rem*, but not necessarily the *jus in rem*. The *jus in re* or *in rem* implies the absolute dominion, — the ownership independently of any particular relation with another person. The *jus ad rem* has for its foundation an obligation incurred by another. Sand. Inst. Just. Introd., xlviii; 2 Marcadé, Expl. du Code Napoléon, 350; 2 Bouvier, (Rawle's Revision,) 73; *The Young Mechanic*, 2 Curtis, 404.

Claimants did not obtain the *jus in rem*, and, according to the great weight of authority, the right of capture was superior.

In *The Frances*, 8 Cranch, 418, a New York merchant claimed two shipments of goods, one in consequence of an advance made to enemy shippers by him in consideration of the consignment, and the other in virtue of a general balance of account due to him from the shippers as their factor. Both consignments were at the risk of the enemy shippers. The goods were condemned as enemy property, and the sentence was affirmed. This court said:

"The doctrine of liens seems to depend chiefly upon the rules of jurisprudence established in different countries. There is no doubt but that, agreeably to the principles of the common law of England, a factor has a lien upon the goods of his principal in his possession, for the balance of account due to him; and so has a consignee for advances made by him to the consignor. . . . But this doctrine is unknown in prize courts, unless in very peculiar cases, where the lien is imposed by a general law of the mercantile world, independent of any contract between the parties. Such is the case of freight upon enemies' goods seized in the vessel of a friend, which is always decreed to the owner of the vessel. . . . But in cases of liens created by

the mere private contract of individuals, depending upon the different laws of different countries, the difficulties which an examination of such claims would impose upon the captors, and even upon the prize courts, in deciding upon them, and the door which such a doctrine would open to collusion between the enemy owners of the property and neutral claimants, have excluded such cases from the consideration of those courts. . ´ . . The principal strength of the argument in favor of the claimant in this case, seemed to be rested upon the position, that the consignor in this case could not have countermanded the consignment after delivery of the goods to the master of the vessel; and hence it was inferred that the captor had no right to intercept the passage of the property to the consignee. This doctrine would be well founded, if the goods had been sent to the claimant upon his account and risk, except in the case of insolvency. But when goods are sent upon the account and risk of the shipper, the delivery to the master is a delivery to him as agent of the shipper, not of the consignee; and it is competent to the consignor, at any time before actual delivery to the consignee, to countermand it, and thus to prevent his lien from attaching. Upon the whole, the court is of opinion that, upon the reason of the case, as well as upon authority, this claim cannot be supported, and that the sentence of the court below must be affirmed with costs."

In *The Mary and Susan*, 1 Wheat. 25, an American merchantman bound from Liverpool to New York was captured by a privateer of the United States during the war of 1812. In her cargo were certain goods which had been shipped by British subjects to citizens of the United States, in pursuance of orders received before the declaration of war. Previous to the execution of the orders the shippers became embarrassed, and assigned the goods to certain bankers to secure advances made by them, with a request to the consignees to remit the amount to the bankers, who also repeated the same request, the invoices being for gain and risk of the consignees, and stating the goods to be then the property of the bankers, and it was held that the goods having been purchased and shipped in pursuance of orders from the consignees, the property was originally vested in them,

and was not devested by the intermediate assignment, which was merely intended to transfer the right to the debt due from the consignees.

In *The Hampton*, 5 Wall. 372, the schooner Hampton and her cargo had been captured, libelled and condemned as prize of war. The master of the vessel was her owner, but interposed no claim; nor did any one claim the cargo. One Brinckley appeared and claimed the vessel as mortgagee. The *bona fides* of this mortgage was not disputed; nor that he was a loyal citizen. But his claim was dismissed, and, the case having been certified to this court, it was held that in proceedings in prize, and under the principles of international law, mortgages on vessels captured *jure belli* are to be treated only as liens subject to be overridden by the capture. Mr. Justice Miller said:

"The ground on which appellant relies is, that the mortgage, being a *jus in re* held by an innocent party, is something more than a mere lien, and is protected by the law of nations. The mortgagee was not in possession in this case, and the real owner who was in possession admits that his vessel was *in delicto* by failing to set up any claim for her. It would require pretty strong authority to induce us to import into the prize courts the strict common law doctrine, which is sometimes applied to the relation of a mortgagee to the property mortgaged. It is certainly much more in accordance with the liberal principles which govern admiralty courts to treat mortgages as equity courts treat them, as a mere security for the debt for which they are given, and therefore no more than a lien on the property conveyed. But it is unnecessary to examine this question minutely, because an obvious principle of necessity must forbid a prize court from recognizing the doctrine here contended for. If it were once admitted in these courts, there would be an end of all prize condemnation. As soon as a war was threatened, the owners of vessels and cargoes which might be so situated as to be subject to capture, would only have to raise a sufficient sum of money on them, by *bona fide* mortgages, to indemnify them in case of such capture. If the vessel or cargo was seized, the owner need not appear, because he would be indifferent, having the value of his property in his

hands already. The mortgagee having an honest mortgage which he could establish in a court of prize, would either have the property restored to him or get the amount of the mortgage out of the proceeds of the sale. The only risk run by enemy vessels or cargoes on the high seas, or by neutrals engaged in an effort to break the blockade, would be the costs and expenses of capture and condemnation, a risk too unimportant to be of any value to a belligerent in reducing his opponent to terms. The principle which thus abolishes the entire value of prize capture on the high seas, and deprives blockades of all danger to parties disposed to break them, cannot be recognized as a rule of prize courts."

In *The Battle*, 6 Wall. 498, the steamer Battle and cargo were captured on the high seas as prize of war, brought into port and condemned, for breach of blockade and also as enemy property. Two claims were set up against the steamer in the court below, one for supplies, and another for materials, furnished, and for work and labor in building a cabin on the boat. These claims were dismissed, and the decree affirmed by this court, Mr. Justice Nelson delivering the opinion, saying: "The principle is too well settled that capture as prize of war, *jure belli*, overrides all previous liens, to require examination."

Such is the rule in the British prize courts. *The Tobago*, 5 C. Rob. 218; *The Marianna*, 6 C. Rob. 24; *The Ida*, Spinks Prize Cases, 26.

*The Tobago* was a case of claim to a captured French vessel, made on behalf of a British merchant as the holder of a bottomry bond executed and delivered to him by the master of the ship before the commencement of hostilities between Great Britain and France. Sir William Scott said:

" The integrity of this transaction is not impeached, but I am called upon to consider whether the court can, consistently with the principles of law that govern its practice, afford relief. It is the case of a bottomry bond, given fairly in times of peace, without any view of infringing the rights of war, to relieve a ship in distress. . . . But can the court recognize bonds of this kind as titles of property, so as to give persons a right to stand in judgment, and demand restitution of such interests in

a court of prize? . . . . The person advancing money on bonds of this nature, acquires, by that act, no property in the vessel; he acquires the *jus in rem*, but not the *jus in re*, until it has been converted and appropriated by the final process of a court of justice. . . . But it is said that the captor takes *cum onere*, and, therefore, that this obligation would devolve upon him. That he is held to take *cum onere* is undoubtedly true, as a rule which is to be understood to apply where the onus is immediately and visibly incumbent upon it. A captor who takes the cargo of an enemy on board the ship of a friend, takes it liable to the freight due to the owner of the ship; because the owner of the ship has the cargo in his possession, subject to that demand by the general law, independent of all contract. . . . But it is a proposition of a much wider extent, which affirms that a mere right of action is entitled to the same favorable consideration in its transfer from a neutral to a captor. It is very obvious that claims of such a nature may be so framed as that no powers belonging to this court can enable it to examine them with effect. They are private contracts, passing between parties who may have an interest in colluding; the captor has no access whatever to the original private understanding of the parties in forming such contracts; and it is, therefore, unfit that he should be affected by them. His rights of capture act upon the property, without regard to secret liens possessed by third parties. . . . I am of opinion that there is no instance in which the court has recognized bonds of this kind as titles of property, and that they are not entitled to be recognized as such in the prize courts."

In *The Marianna*, the vessel had been sold at Buenos Ayres by American owners to a Spanish merchant; the purchase money, however, had not been paid in full, but was to be satisfied out of the proceeds of a quantity of tallow on board the vessel for sale, consigned to the agents of the American vendors at London. The vessel was seized on her voyage to England, documented as belonging to a Spanish merchant, and sailing under the flag and pass of Spain. The former American proprietors made claim to the cargo, but the claim was

disallowed because the claimants' interest was not sufficient to support it ; and the court said :

" Captors are supposed to lay their hands on the gross tangible property, on which there may be many just claims outstanding, between other parties, which can have no operation as to them. If such a rule did not exist, it would be quite impossible for captors to know upon what grounds they were proceeding to make any seizure. The fairest and most credible documents, declaring the property to belong to the enemy, would only serve to mislead them, if such documents were liable to be overruled by liens which could not in any manner come to their knowledge. It would be equally impossible for the court, which has to decide upon the question of property, to admit such considerations. The doctrine of liens depends very much on the particular rules of jurisprudence which prevail in different countries. To decide judicially on such claims, would require of the court a perfect knowledge of the law of covenant, and the application of that law in all countries, under all the diversities in which that law exists. From necessity, therefore, the court would be obliged to shut the door against such discussions and to decide on the simple title of property, with scarcely any exceptions. . . . As to the title of property in the goods, which are said to have been going as the funds out of which the payment for the ship was to have been made. That they were going for the payment of a debt will not alter the property ; there must be something more. Even if bills of lading are delivered, that circumstance will not be sufficient, unless accompanied with an understanding that he who holds the bill of lading is to bear the risk of the goods as to the voyage, and as to the market to which they are consigned ; otherwise, though the security may avail *pro tanto*, it cannot be held to work any change in the property."

These cases were cited by Dr. Lushington in *The Ida* as settling the law. In that case, claim was made by a neutral merchant to a cargo of coffee which had been consigned to him by an enemy on the credit of certain advances, as security for payment of which bills of lading covering the cargo had been delivered to him. But the court declined to recognize the lien,

and condemned the cargo as enemy property. Dr. Lushington referred to *The San Jose Indiano and Cargo*, 2 Gallison, 267, and subscribed to what was there said by Mr. Justice Story, but thought his remarks inapplicable to the case in hand.

The case referred to was affirmed by this court. 1 Wheat. 208. Goods were shipped by Dyson, Brothers and Company of Liverpool on board a neutral ship bound to Rio de Janeiro, which was captured and brought into the United States for adjudication. The invoice was headed : " Consigned to Messrs. Dyson, Brothers, and Finnie, by order and for account of J. Lizaur." In a letter accompanying the bill of lading and invoice, Dyson, Brothers and Company wrote Dyson, Brothers, and Finnie : " For Mr. Lizaur we open an account in our books here, and debit him, etc. We cannot yet ascertain the proceeds of his hides, etc., but find his order for goods will far exceed the amount of these shipments, therefore we consign the whole to you, that you may come to a proper understanding with him." The two houses consisted of the same persons. It was held that the goods were, during their transit, the property and at the risk of the enemy shippers, and therefore subject to condemnation. Lizaur's claim was rejected although Dyson, Brothers and Company had the proceeds of his hides in their hands.

*The Lynchburg*, Blatchford's Prize Cases, 57, and *The Amy Warwick*, 2 Sprague, 150, are cited on behalf of claimants, but, as we read them, they do not sustain their contention. The schooner Lynchburg with a cargo of coffee had been libelled during the civil war as enemy property, and also for an attempt to violate blockade. Brown Brothers and Company, loyal citizens, intervened as claimants of 2045 bags of coffee, part of the cargo. They alleged that they had made an advance of credit to Maxwell, Wright and Company, neutral merchants of Rio de Janeiro, for the purchase of the coffee, under which credit Maxwell, Wright and Company drew drafts on Brown Brothers and Company for £6000, on the condition expressed therein that the coffee purchased by claimants should be held until their advances were reimbursed thereon. It was admitted by the United States attorney that 1541 bags of the coffee

should be released to Brown Brothers and Company, and that was done. As to the remaining 504 bags embraced in the general claim of Brown Brothers and Company, in which Wortham and Company of Virginia, asserted an interest, it was held by the court that as no proof was given by claimants that the value of the 1541 bags restored to them was not equivalent to the sum of their advances used in purchasing the whole 2045 bags, the reasonable presumption was that the restoration satisfied the entire advance. And Judge Betts said: "The claim to an absolute ownership of the 2045 bags was placed before the court in the oral argument, and in the written points filed in the cause by the counsel for the claimants, upon the proposition of law, that a bill of lading, transmitted to them by the shipper to cover advances, passed to them the title to the cargo purchased therewith. If this doctrine be correct as to mere commercial transactions, it does not prevail in prize courts, in derogation of the rights of captors, when the interest of the claimants is only a debt, although supported by liens equitable and tacit, or legal and positive, even of the character of bottomry bonds, when not signified on the ship's papers at the time of her capture. *The Frances*, 8 Cranch, 418; *The Tobago*, 5 C. Rob. 218; *The Marianna*, 6 C. Rob. 24. Here, the vessel was an enemy bottom; the bill of lading consigned the cargo to order or assigns, at large, at an enemy's port, and, on the surrender of the principal portion of the consignment to the claimants, no other evidence was given in establishing the facts that the remainder of the shipment was owned by them, or yet stood under hypothecation to them on the bill of lading." The 504 bags were condemned, "because, by intendment of law, that portion belonged to Wortham and Company, and was not shown by the proofs to be exempt from capture as prize."

In *The Amy Warwick*, J. L. Phipps and Company of New York, British subjects, purchased 4700 bags of coffee, part of the cargo of an enemy vessel, which they had purchased through Phipps Brothers and Co., their firm at Rio, with funds of an enemy firm, and £2000 of their own money by draft on Phipps and Co., their firm at Liverpool. They took from the master

a bill of lading which stated that Phipps Brothers and Company were the shippers of this coffee, and that it was to be delivered to their order. Indorsed on the bill of lading was a statement declaring that a portion of the coffee was the property of British subjects. Phipps Brothers and Company indorsed the bill of lading over to J. L. Phipps and Co. They also delivered to the master another part of the bill of lading, an invoice of the coffee, and a letter of advice to be conveyed to the firm in New York. This letter stated that the coffee was shipped for account of merchants at Richmond, Virginia, and that a bill of lading would have been sent to them had it not been deemed advisable by reason of the unsettled state of political affairs, for the better protection of the property, and to prevent privateers from molesting the vessel, to have it certified on the bill of lading that a portion of the coffee was British property, and that this referred to the portion against which they had valued on Liverpool. It was held that the facts led plainly to the conclusion that claimants ought to be repaid the amount they had expended from their own funds in the purchase of the coffee and that the residue of the proceeds should be condemned. It was said that as the coffee was purchased at Rio by the claimants, and shipped by them on board the vessel under a bill of lading by which the master was bound to deliver it to their order, and they ordered it to be delivered to J. L. Phipps and Co., that is, to themselves, they were the legal owners of the property, and could hardly be said to have a lien upon it. Their real character was that of trustees holding the legal title and possession with a right of retention until their advances should be paid. The doctrine of liens was considered, and *The Frances, The Tobago, The Marianna* and other cases examined. Judge Sprague was of opinion that the rule in such cases ought not to be that which stops at the mere legal title, but that which ascertains and deals with the real beneficial interest, " for, if the court were never to look beyond the legal title, the result would be that when such title is held by an enemy in trust for a neutral, the latter loses his whole property; but, when the legal title is in a neutral in trust for an enemy, the property is restored to the neutral, not for his benefit, but

merely as a conduit through which it is to be conveyed to the enemy. To refuse to look beyond the legal title is to close our eyes for the benefit of the enemy. It would enable him always to protect his property by simply putting it in the name of a neutral trustee."

We agree with counsel for the United States that notwithstanding the indorsement of Gibernau and Company on the bills of lading, the proof of a neutral title was not sufficient. Even if when the neutral interest is adequately proven to be *bona fide*, the claim of the captors may be required to yield, yet in this case the belligerent right overrides the neutral claim, which must be regarded merely as a debt, and the assignment as a cover to an enemy interest.

Something was said in argument in relation to the character of the cargo. It is true that by the modern law of nations, provisions, while not generally deemed contraband, may become so, although belonging to a neutral, on account of the particular situation of the war, or on account of their destination, as, if destined for military use, for the army or navy of the enemy, or ports of naval or military equipment. *The Benito Estenger*, 176 U. S. 568; *The Panama*, 176 U. S. 535; *The Peterhoff*, 5 Wall. 28; Grotius De Jure Belli et Pacis, lib. III, c. 1, § 5; Hall, § 236.

Doubtless, in this instance, the concentration and accumulation of provisions at Havana might fairly be considered a necessary part of Spanish military operations, *imminente bello*, and these particular provisions were perhaps especially appropriate for Spanish military use; but while these features may well enough be adverted to in connection with all the other facts and circumstances, we do not place our decision upon them.

We are of opinion that a valid transfer of title to this enemy property to claimants was not satisfactorily made out, and that

*The decree below must be reversed, and a decree of condemnation directed to be entered, and it is so ordered.*

MR. JUSTICE SHIRAS, with whom concurred MR. JUSTICE BREWER, dissenting.

This is an appeal from a decree of the District Court of the United States for the Southern District of Florida, awarding to Kleinwort Sons & Company, the claimants, the proceeds of the sale of the cargo of the Spanish bark Carlos F. Roses.

The vessel sailed under the Spanish flag, and was owned, officered and manned by Spaniards. On or about March 14, 1898, Pla Gibernau & Company, a firm of commission merchants doing business at Montevideo, in the Republic of Uruguay, shipped on board the bark, then lying at Montevideo, a cargo consisting of about 275,000 kilos of jerked beef and 20,000 strings of garlic. The property was consigned upon three bills of lading to the order of the shippers; and two bills of exchange, at ninety days, were drawn upon the claimants, Kleinwort Sons and Company, British subjects, domiciled and doing business as bankers at London, England. One of these bills, for £2714 3 8, was drawn by Pla Gibernau & Company to the order of the London and River Plate Bank, Limited, a banking concern doing business in Montevideo; the other, for £3583 11 6, was drawn by the master of the Carlos F. Roses to the order of Pla Gibernau & Company, and was by them indorsed to the order of the London and River Plate Bank, Limited.

The bills of exchange and the bills of lading came that day, March 15, 1898, into the possession of the London and River Plate Bank, which cashed the drafts, and forwarded them for acceptance to Kleinwort Sons & Company at London, who accepted them on April 6, 1898, and paid them when due. At the time these bills of exchange were accepted the bills of lading, indorsed by Pla Gibernau & Company, came into the possession of the claimants.

The vessel sailed from Montevideo for Havana on March 16, 1898. On April 25, 1898, war between Spain and the United States was declared, and on May 17, when in the Bahama Channel, on her course to Havana, the Carlos F. Roses was captured by a war vessel of the United States, and sent in charge of a prize crew to Key West.

MR. JUSTICE SHIRAS and MR. JUSTICE BREWER, dissenting.

On June 2, 1898, the District Court condemned the vessel as enemy's property, seized upon the high seas. On February 9, 1899, the District Court held that, as it satisfactorily appeared from the proof that both the title and the right of possession to the cargo were in a neutral at the time of the capture, as evidenced by the indorsed bills of lading and the paid bills of exchange presented at the hearing, the claim should be allowed, and it was so ordered. Thereupon the United States took this appeal.

It is admitted that, if the cargo in question belonged to a neutral, and was not contraband of war, it was not liable to confiscation, though found in an enemy's vessel: this upon well-established principles of international law, and as within the President's proclamation of April 26, 1898, expressly declaring that "neutral goods, not contraband of war, are not liable to confiscation under the enemy's flag."

It can scarcely be pretended that, in this instance, the cargo consisted of articles contraband of war. They were the ordinary products of the Republic of Uruguay, a country with which the United States were at peace, and were purchased and shipped six weeks before war was declared. Little, if anything, is left for the commerce of neutrals if such goods, shipped in such circumstances, are not within the protection of the President's proclamation.

The question is whether the District Court erred in finding that the goods in question were neutral goods and exempt, as such, from condemnation.

The first contention, on behalf of the United States, is that the affidavits and exhibits relied on by the claimants to prove their title were not competent evidence, and it is urged that the evidence should have been in the form of depositions, taken under a commission, and of documents duly proved.

We think it is a sufficient reply to this objection that the proofs were received and considered by the District Court upon the trial entirely without objection on the part of the United States or the captors; and that the action of the court in receiving the evidence was not among the assignments of error made and filed under the appeal.

"If evidence in the nature of further proof be introduced, and no formal order or objection appear on the record, it must be presumed to have been done by consent of the parties, and the irregularity is completely waived. In the present case, no exception was taken to the proceedings or evidence in the District Court; and we should not, therefore, incline to reject the further proof, even if we were of opinion that it ought not, in strictness, to have been admitted." *The Pizarro*, 2 Wheat. 241, per Mr. Justice Story.

Rule 13 of this court is as follows:

"In all cases of equity and admiralty jurisdiction heard in this court, no objection shall hereafter be allowed to be taken to the admissibility of any deposition, deed, grant or other exhibit found in the record as evidence, unless objection was taken thereto in the court below and entered of record; but the same shall otherwise be deemed to have been admitted by consent."

It is next contended that the claimants' evidence, regarded as a whole, does not support the decree of the court below. It is said that the burden of proof is upon the claimants, and that this burden has not been sustained.

This was not the view of the District Court, which, as we have heretofore stated, held that it appeared satisfactorily from the proof that both the title and right of possession were in a neutral at the time of capture.

What are the matters urged against this finding of the court below?

It is argued that, because it appears in the invoices and in the manifest that the shipments were made partly on account of "the expedition or voyage of the Carlos F. Roses," partly on account of "Mr. Pedro Pagés of Havana," and partly on account of the shippers, that is, Gibernau & Company, it is a reasonable inference that it must have been known to the master that the consignees were, as to some of the cargo, enemies, and that it must be concluded, on the face of the papers, that when the goods were delivered to the vessel they became the property of the consignees named in the invoices.

Such a view loses sight of the decisive and indisputable facts that the money used by Gibernau & Company in the purchase

of the goods was procured from the London and River Plate Bank, which cashed the drafts drawn on Kleinwort Sons & Company, the claimants, and that when the latter company, on April 6, accepted the drafts they were furnished with the bills of lading covering the entire shipment; that the said bills of lading, at the time of such delivery, were duly indorsed in blank by Gibernau & Company, the shippers, and to whose order the said cargo was by the terms of the bills of lading to be delivered, all with the intent and result of entitling Kleinwort Sons & Company to the said bills of lading and to the cargo described therein as security for their acceptance of the drafts. It hence was entirely immaterial whether the ultimate consignees were, as to some of the cargo, residents of the enemy's country, and whether that fact was known to the master. Under the facts proved by the claimants the latter, through the London and River Plate Bank, had furnished the money used in the purchase of the goods, before the sailing of the vessel. This is made plainly to appear by the invoices furnished by the shippers, and wherein is stated that the master received the goods from Pla Gibernau & Company, and wherein also there is a statement of the cost of the goods and of the commissions charged by Gibernau & Company, corresponding in amount to the drafts.

The fact that the claimants' proofs do not set forth the correspondence between the claimants and the ultimate consignees is made a matter of unfavorable comment. But the transactions were substantially described in the affidavits, and it is not easy to see what further light would have been afforded by such correspondence, if, indeed, there was such correspondence.

The purchase of the goods, the drawing and cashing of the drafts, the indorsement and delivery of the bills of lading, all took place before the sailing of the vessel, and long before the declaration of war, and before there was any reason to anticipate hostilities. The drafts were accepted before the war, and were paid before the seizure of the vessel.

No counter evidence was offered by the United States, although the case was pending in the District Court from June 6, 1898, to February 9, 1899, when the decree in favor of the claimants was entered. It is, of course, true that the burden

of proof was on the claimants, but when the Government elected to stand on the proof adduced by the claimants, every fair and reasonable intendment must be made in favor of that proof. If the case so made out is consistent with the rightfulness of the claim, it should not be defeated by mere suggestions and suppositions, not founded on evidence. "All reasonable doubts shall be resolved in favor of the claimants. Any other course would be inconsistent with the high administration of the law and the character of a just government." *Prize Cases*, 2 Black, 635.

The final contention on behalf of the United States is that, even if the facts of the case were as set forth in the claimants' proofs, and as found by the District Court, yet, as matter of law, the claimants cannot succeed, because "the right of capture acts on the proprietary interest of the thing captured at the time of the capture, and is not affected by the secret liens or private engagements of the parties; that hence prize courts have rejected in its favor the lien of bottomry bonds, of mortgages, for supplies, and of bills of lading; . . . that claimants did not obtain the *jus in rem*, and, according to the great weight of authority, the right of capture was superior."

To sustain this proposition the following cases are cited: *The Mary and Susan*, 1 Wheat. 25; *The Frances*, 8 Cranch, 418; *The Sally Magee*, 3 Wall. 451; *The Hampton*, 5 Wall. 372; *The Battle*, 6 Wall. 498; *The Tobago*, 5 C. Rob. 218; *The Marianna*, 6 C. Rob. 24; *The Ida*, 1 Spinks' Prize Cases, 331.

The *Mary and Susan* was a case where an American house had ordered the purchase of goods in England before the declaration of war, and where their English agents had assigned the goods to certain brokers to secure advances made by them. The goods were captured en route to America, and were libelled in the District Court of the District of New York as prize of war. But it was held, both in the Circuit Court and in this court, that the property had vested in the American firm, who were the claimants, before and at the time of shipment, and was not divested by a mere request made by the shippers to the consignees to remit the purchase money to the bankers, although in the invoice it was stated that the goods were the property of the bankers.

MR. JUSTICE SHIRAS and MR. JUSTICE BREWER, dissenting.

The transaction was regarded, not as a transfer of the goods, but as merely intended to transfer the right to the debt due from the consignees. No bills of exchange were drawn on the consignees in favor of the English bankers, nor were any bills of lading indorsed to them. The evidence of the transaction was found only in letters addressed to the consignees by the shippers, requesting them to pay the purchase money to the bankers; and this court held, after a careful examination of the evidence, that there was no intention to secure the bankers by any transfer of the title of the property, but only to secure them by a transfer of the debt due from the consignees.

The case of *The Frances* was an appeal from the sentence of the Circuit Court of Rhode Island, condemning certain British goods, captured on board the Frances, and which were claimed by Thomas Irvin, a domiciled merchant of the United States, on the ground of lien. It was stated by Mr. Justice Washington that "it was not pretended that the real ownership in these goods was not vested in the consignors, enemies of the United States; but the claimant founds his pretensions on a lien created on the goods consigned, in consequence of an advance made to the shippers, in consideration of the consignment, by his agent in Glasgow, and also in virtue of a general balance of account due to him as their factor." And it was held that while, according to the common law, a factor has a lien upon the goods of his principal in his possession, for the balance of account due him, and likewise a consignee for advances made by him to the consignor; yet that this doctrine is unknown in prize courts, unless in very peculiar circumstances. And the court referred to the case of *The Tobago*, 5 C. Rob. 196, where it was held that a lien on a vessel created by a bottomry bond was not protected from capture.

It will be seen that in this case of *The Frances*, as in the case of *The Mary and Susan*, there was no question of the effect of a transfer of title by bills of lading, but a mere assertion of a lien by virtue of common law principles.

The *Sally Magee* is the next case cited. This was the case of an enemy's vessel bound for an enemy's port. A portion of the cargo was claimed by Fry, Price & Company, for Coleman &

Company, a Rio firm, because, as was alleged, Coleman & Company, as factors and commission merchants, had been directed to purchase and ship for the account of Davenport & Company, of Richmond, Va., a cargo of coffee, if procurable at not over ten and a half cents per pound; that Coleman & Company did make the shipment of the cargo claimed to the consignment of Davenport & Company, but that by the invoice thereof it appeared that the said purchase was not made at or within the said limit; for which cause Davenport & Company had refused to receive it as purchased for their account, or otherwise than on account of the shippers, Coleman & Company, and as agents of necessity for them; and that Davenport & Company had been authorized to receive it in their place and behalf. Another claim related to the residue of the cargo, also coffee, consigned to Dunlop & Company, of Richmond. It was not denied that this portion of the cargo was enemy's property, but the claimants alleged a lien because of a balance due claimants by Dunlop & Company.

In respect to the first claim, it was held that if Coleman & Company, as factors, bought the coffee at a price exceeding the limit prescribed by Davenport & Company, and the latter, on learning the fact, repudiated the purchase, the title of the factors thereupon became absolute, and none passed to the principals for whom the purchase was made; but that there was an entire failure, on the part of the claimants, to prove the facts as alleged, although more than two years had elapsed between the filing of the claim and the time when the decree was rendered. Accordingly, the decree of condemnation as to that portion of the cargo was affirmed.

The language of the court in disposing of the second claim was as follows:

" The other claim relates to the coffee consigned to Dunlop & Company, of Richmond, and it is not denied that this was enemy's property. The claimants allege a lien. The claim states that Dunlop & Company owed them a balance of upward of $35,326, and that they were authorized and directed by that firm to receive and sell the coffee, and apply the proceeds, as far as necessary, to the payment of the debt, and to hold the

balance for the debtor firm. The same affiant made the test affidavit, as in the other case. He referred, as in that case, to an important correspondence, and failed to produce it. The same remarks apply to that subject. It is to be inferred, also, that the letters were written after the shipment of the cargo, and, indeed, after the capture. In either case, the arrangement was made too late to have any effect.

"The ownership of property in such cases cannot be changed while it is *in transitu.* The capture clothes the captors with all the rights of the owner which subsisted at the commencement of the voyage, and everything done thereafter, designed to incumber the property or change its ownership, is a nullity. No lien created at any time by the secret contention of the parties is recognized. Sound public policy and the right administration of justice forbid it. This rule is rigidly enforced by all prize tribunals. The property was shipped to the enemy. It was diverted from its course by its capture. The allegation of a lien wears the appearance of an afterthought."

It will be observed that there was no effort in this case to claim property vested or transferred by bills of lading. Indeed, it appeared that the bills of lading were made out in favor of the consignees at Richmond, and it was said by the court that the legal effect of a bill of lading was to vest the ownership in the consignees, citing *Lawrence* v. *Minturn*, 17 How. 100, in which it was said that "the general effect of a bill of lading to raise a presumption of property in goods in him to whom it makes them deliverable, is conceded."

Next comes the cited case of *The Hampton*, libelled and condemned as prize of war in the Supreme Court for the District of Columbia. It was held that mortgages on vessels captured *jure belli* are to be treated only as *liens*, subject to be overridden by the capture, not as *jura in re*, capable of an enforcement superior to the claims of the captor.

Then comes the case of *The Battle*, where there were claimants against the proceeds of sale of an enemy's vessel for supplies furnished and for materials furnished and for work and labor. The claims were dismissed by the District Court of the United States, and on appeal that decree was affirmed by this court,

which, through Justice Nelson, said : "The principle is too well settled, that capture as prize of war overrides all previous liens, to require examination," citing the cases of *The Hampton* and *The Frances.*

These are all the American cases cited, and it is to be observed that, in none of them, was the court called upon to decide the question whether bills of lading made or indorsed to neutrals, before the declaration of war, on account of money furnished to purchase cargoes, are protected as neutral goods from capture, within the general international rule, and the President's proclamation, protecting such goods, when not contraband, from condemnation as prize of war. The doctrine of these cases simply amounts to the proposition, that bottomry bonds, mortgages and private agreements that factor's balances and advances should be preferred claims, are mere *liens,* which create no property rights in vessels or cargoes, superior to the captor's rights.

Let us now examine the English cases cited.

The first is that of *The Tobago,* 5 C. Rob. 218. This was the case of a bottomry bond, and it was held that such a bond confers no property in the vessel ; that the property continues in the former proprietor, who has given a right of action against it, but nothing more. In the case of *The Marianna,* 6 C. Rob. 24, there was a claim against a Spanish vessel, for unpaid purchase money on the vessel which had been sold by an American owner to a Spanish merchant, but which was to be satisfied out of the proceeds of a quantity of tallow consigned to England on board this vessel for sale. Sir William Scott said:

"A claim is given on behalf of the former American proprietor, in virtue of a lien which he is said to have retained on the property for the payment of the purchase money, but such an interest cannot, I conceive, be deemed sufficient to support a claim of property in a court of prize."

In respect to the goods which were said to have been pledged to secure the payment of the purchase money of the ship, Sir William Scott said:

"Then as to the title of property in the goods which are said to have been going as the funds out of which the payment for

the ship was to have been made. That they were going for the payment of a debt will not alter the property; there must be something more. Even if bills of lading are delivered, that circumstance will not be sufficient, unless accompanied with an understanding that he who holds the bill of lading is to bear the risk of the goods as to the voyage, and as to the market to which they are consigned; otherwise, though the security may avail *pro tanto*, it cannot be held to work any change in the property."

It will be noticed that the shipper of the goods in this case was the Spanish merchant, an enemy.

Finally, the case of *The Ida* is relied on. 1 Spinks' Prize Cases, 331. The statement of the case was as follows:

"The claim of neutral merchants for 2650 bags of coffee, consigned to them on the credit of advances made by them was disallowed. The claim is that of *lien*, which cannot be upheld against captors. Further proof cannot be allowed when there has been an attempt to deceive the court by simulated papers."

In considering the evidence in the case, Dr. Lushington said:

"Now, that simulated bill of lading was certainly framed for some purpose or other by desire of the master. It is a well-known rule of this court that where there are contradictory papers the burden of proof lies on the claimant to show that the contradiction is not inconsistent with the rights of a belligerent power; and, I must say, I have not heard any satisfactory explanation of how or why these papers were framed, except it was for the purpose of deceiving those who might have to determine whether it was an enemy's property or not."

In discussing the law of the case, Dr. Lushington said:

"It is contended by counsel that the property is in Behrens & Company by virtue of the endorsement of the bills of lading; and cases from common law have been cited in support of this. I believe that, in some circumstances, that would be the case. They would have a legal title to the property; but I have considerable doubt whether it is not the law of this court that the claimant must show that he has not only a legal, but an equitable title. If a mere legal title would justify the court in restoring property the consequences would be most alarming;

for nothing would be more easy than to cover enemies' property from one end of the kingdom to the other. I strongly object to the doctrine that if a legal title be shown this court is bound to restore; for I hold that an equitable title is also necessary to support a claim in this court."

Upon the whole, the learned judge was of the opinion that the property belonged to an enemy, subject to claimant's charges, and that it was not possible to doubt for a single moment that there was an intention in the case, by means of colorable bills of lading, to deceive and defraud Great Britain of its belligerent rights, by attempting to cover enemy's property as neutral.

The case of *The Ida* can therefore be cited as conceding that, if the claimants had vested in them the legal title to the goods by virtue of the indorsement of the bills of lading, and had also an equitable title, they would be entitled to a judgment of restoration. But the court was of opinion that there was no evidence whatever of any portion of the cargo belonging to a neutral. While it was true that the claimants exhibited a bill of lading indorsed to them, yet another bill of lading not indorsed was found on capture in possession of the master. Such a state of facts justly created a belief that the transaction was essentially fraudulent, as an attempt to cover enemy's property.

We shall now consider some of the cases cited on behalf of the claimants.

*The Amy Warwick,* 2 Sprague, 150; 2 Black, 635, is, in several respects, a leading case, and is decisive of the present one. It was there held that, where a neutral commission merchant purchased a cargo of coffee for enemy correspondents, partly with their funds and partly with his own, and shipped it under a bill of lading by which it was to be delivered to his order, having a legal title and a beneficial interest, a prize court should award him the amount of his advances, although the residue of the property will be condemned as enemy's.

After a full statement of the facts, the conclusion was thus stated by Judge Sprague:

" The claim of J. L. Phipps & Company was filed on the 4th of September last. It alleges that this coffee was purchased by them partly by funds of Dunlop, Moncure & Company, of Rich-

Mr. Justice Shiras and Mr. Justice Brewer, dissenting.

mond, and partly by £2000 of their own money; that the legal title has always remained in them, and that no other person is the legal owner, except the equitable interest of said Dunlop, Moncure & Company.

"These facts seem plainly to lead to the conclusion that the claimants ought to be repaid the amount which they expended from their own funds in the purchase of the coffee, and that the residue of the proceeds should be condemned. This result I shall adopt, unless precluded from doing so by authority.

"The counsel for the captors contend that the claimants had only a lien, and that liens will not be protected or regarded in a prize court. This position is sustained by the authorities as to certain kinds of liens. The extent of this doctrine and the reasons on which it is founded are stated by the Supreme Court in *The Frances*, 8 Cranch, 418. It is there said that 'cases of liens created by the mere private contract of individuals, depending upon the different laws of different countries, are not allowed, because of the difficulties which would arise in deciding upon them, and the door which would be open to fraud.' Similar reasons are given by Lord Stowell in *The Marianna*, 6 C. Rob. 24, and in several other cases. These reasons are especially applicable to latent liens created under local laws. They do not reach the case now before the court. This coffee was purchased by the claimants at Rio, and shipped by them on board this brig under a bill of lading, by which the master was bound to deliver it to their order, and they ordered it to be delivered to J. L. Phipps & Company, that is, to themselves. They then retained the legal title, and the possession of the master was their possession. Being the legal owners of the property, they can hardly be said to have a lien upon it; a lien being in strictness an incumbrance upon the property of another. Their real character was that of trustees holding the legal title and possession, with a right of retention until their advances should be paid. . . . The case of *The San Jose Indians*, 1 Wheat. 208, has been cited by the counsel for the claimants, and they contend that it sustains their whole claim, and requires all the coffee to be restored to them. That case is a stringent authority to the extent of the £2000 which the claimants invested or ad-

vanced in the purchase; but I do not think that it authorizes me·to go further."

This case was taken to the Circuit Court and there affirmed. No appeal was taken to· the Supreme Court from that part of the decree which allowed the claim of Phipps & Company. The decree of condemnation of the residue was affirmed. 2 Black, 635.

The· bark Winifred was captured in May, 1861, off Cape Henry, and confiscation of vessel and cargo was demanded as being enemy's property. The cargo, consisting of 4200 bags of coffee, had been purchased by Phipps & Company in Rio, as agents for Crenshaw & Company, Richmond merchants. Phipps & Company advanced their own funds to the extent of three eighths of the cargo. The consignment formally was to ship-per's order, but the bills of lading were sent forward indorsed to Crenshaw & Company. Subsequently, Phipps & Company made further advances· of $20,622 on April 26, while the goods were in transit, and, after the outbreak of hostilities, taking a reassignment of the bills of lading. The District Court ordered a restoration of three eighths of the cargo to Phipps & Company, but refused to allow their claim for the further advances on the other five eighths of the cargo, citing *The Marianna*, 6 C. Rob. 24, and *The Frances*, 8 Cranch, 418. But on appeal the Circuit Court, while affirming the decree allowing the claim against the three eighths of the cargo, reversed that part of the decree· which refused the claim for the further advances, allowed further proofs, and in December 1863, allowed the entire claim of Phipps & Company, with interest. *The Winifred*, Blatch-ford's Prize Cases, page 35, and note.

The Lynchburg was captured with her cargo in May, 1861, at the mouth of Chesapeake Bay. Two thousand and forty-five bags of coffee, part of her cargo, had been purchased by Maxwell, Wright & Company, as agents for Wortham & Company, of Richmond. Maxwell, Wright & Company took bills of lading, consigning the cargo to their own order, and drew against them on Brown, Shipley & Company, of London, for £6090, who accepted the drafts and subsequently paid them. The entire cargo was destined ultimately for enemies. Wortham &

MR. JUSTICE SHIRAS and MR. JUSTICE BREWER, dissenting.

Company, of Richmond, claimed 504 bags of this shipment, subject to the lien of Brown, Shipley & Company. The District Court restored to Brown, Shipley & Company 1541 bags, but condemned the 504 bags claimed by Wortham & Company as enemy's property. Judge Betts said:

"The claim to an absolute ownership of the 2045 bags was placed before the court in the oral argument and in the written points filed in the cause by the counsel for the claimants, upon the proposition of law that a bill of lading, transmitted to them by the shipper to cover advances, passed to them the title to the cargo purchased therewith. If this doctrine be correct as to mere commercial transactions, it does not prevail in prize courts in derogation of the rights of captors, when the interest of the claimant is only a debt, although supported by liens equitable and tacit, or legal and positive, even of the character of bottomry bonds, when not signified on the ship's papers at the time of capture. *The Frances*, 8 Cranch, 418; *The Tobago*, 5 C. Rob. 218; *The Marianna*, 6 C. Rob. 24."

On appeal the Circuit Court affirmed as to the allowance of the claim of Brown, Shipley & Company for the 1541 bags, but reversed the refusal of their further claim for 504 bags, allowed the claimants to give further proofs, and ultimately the 504 bags were restored by consent to the claimants. *The Lynchburg*, Blatchford's Prize Cases, 51, and note on p. 52.

The exigencies of trade have called a class of instruments into being which are substantially acknowledgments by public or private agents that they have received merchandise, and from whom or on whose account; and usage has made the possession of such documents equivalent to the possession of the property itself. Among them the most notable is the bill of lading, in respect to which, and replying to the question whether at law the property of goods at sea passes by the indorsement of a bill of lading, Buller, J., said, in his opinion in *Lickbarrow* v. *Mason*: "Every authority which can be adduced, from the earliest period of time down to the present hour, agree that at law the property does pass as absolutely and as effectually as if the goods had been actually delivered into the hands of the con-

signee." Smith's Leading Cases, vol. part 11, 7th Am. ed. under the head of *Lickbarrow* v. *Mason.*

The conclusion warranted by the cases is that, as well advances made for the purchase of goods, as an absolute purchase, are protected by bills of lading, whether made out directly to the party purchasing or making the advancements, or indorsed to him by the shipper.

While possession of the bills of lading imports a legal title to the goods, yet in prize cases it is permitted for the courts to go behind the bills of lading, if there is evidence tending to show that the party in whose name they are issued, or to whom they have been indorsed, has no equitable interest or is a mere cover to an enemy. In the present case there was no transfer of the property from an enemy to a neutral. Up to the time of shipment the entire cargo was owned by Pla Gibernau & Company. They transferred it to the London and River Plate Bank, Limited, who in turn transferred it to Klienwort Sons & Company, who produced the bills of lading at the hearing and moved the payment by them, before the capture of the vessel, of the drafts whose negotiation furnished the moneys used in the purchase of the goods. The entire issue of each set of bills of lading was possessed by Kleinwort Sons & Company, under indorsements which gave to them only the right to demand delivery from the vessel.

The case falls plainly within the law as administered in *The Amy Warwick, The Winifred* and *The Lynchburg.*

If the rule asked for by the captors in this case should be upheld, namely, that bills of lading indorsed to neutrals, acting in good faith, who have advanced money to purchase goods shipped long before the declaration of war, do not create a right of property in the goods, there would be very little room left for the operation of the President's proclamation exempting neutral goods from condemnation. Such a rule would be very unfortunate as respects the commerce of the United States in case of hostilities between European countries. Owing to the limited amount of merchant shipping owned in the United States, the greater part of their products, whether breadstuffs or manufactured goods, has to be carried in foreign vessels, and

MR. JUSTICE SHIRAS and MR. JUSTICE BREWER, dissenting.

it is quite evident that bankers and capitalists could not afford to advance the moneys needed to make purchases, if they could not be protected against seizure by foreign belligerents, by the indorsement to them of bills of lading. Only those who actually own the goods could safely ship them on vessels owned by belligerents, and, what constitutes the larger part of international trade, the purchase and shipment of merchandise by factors with moneys advanced by banking houses would, in case of war, have to cease. The decree of the District Court should be affirmed.