(PRIZE.)

## The Mary and Susan.—G. & H. VAN WAGENEN, Claimants.—

Where goods were shipped in the enemy's country, in pursuance of orders from this country received before the declaration of war, but previous to the execution of the orders, the shippers became embarrassed, and assigned the goods to certain bankers to secure advances made by them, with a request to the consignees to remit the amount to them, (the bankers,) and they also repeated the same request, the invoice being for account and risk of the consignees, but stating the goods to be then the property of the bankers, it was held, that the goods having been purchased and shipped in pursuance of orders from the consignees, the property was originally vested in them, and was not devested by the intermediate assignment, which was merely intended to transfer the right to the debt due from the consignees.

APPEAL from the circuit court for the district of New-York. The goods in question were part of the cargo of the ship Mary and Susan, a merchant vessel of the United States, which was captured on the 3d of September, 1812, by the Tickler, a private armed vessel of the United States. The cargo was libelled as prize of war; this portion claimed by Messrs. G. & H. Van Wagenen, and condemned in the district court. In the circuit court this sentence was reversed, and restitution to the claimants was ordered; from which decree the captors appealed to this court. The cause having been heard in both the courts below, on the documentary evidence found on board, the original order for the goods does not appear. That they were shipped in consequence of

orders, is, however, sufficiently proved by the letters addressed to the claimants, and the other papers which accompanied them. These are, 1. An invoice headed in the words following:

" *Birmingham,* 8th *July,* 1812.
*Say* 15th *March,* 1811.

" Invoice of fourteen casks and four baskets of hardware, bought by Daniel Cross & Co. by order, and for account and risk, of G. & H. Van Wagenen, Merchants, New-York, marked and numbered as per margin, and forwarded on 4th March, 1811, to care of Martin, Hope, & Thornley, Liverpool, and by them afterwards transferred to the care of T. and W. Earle & Co. of Liverpool; which goods are now the property of Messrs. Spooner, Attwood & Co., Bankers, of Birmingham, to whom you will please to remit the amount of this invoice."

And containing at the foot, after the enumeration of the articles and their prices in the usual form, the following charges:

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| " Amount of Invoice, | | | £ 1041 | 0 | 11 1-2 |
| " Commission 5 per cent. | | | 52 | 1 | 0 1-2 |
| | | | £ 1093 | 2 | 0 |
| " Freight to Liverpool, | £ 12 | 18 | 0 | | |
| Entry and Town Dues, | | 6 | 0 | | |
| Cartage, porterage, and cooperage, | 4 | 15 | 0 | | |
| Bill of Lading, | | 3 | 6 | | |
| Export Duty 4 per cent. | 40 | 4 | 0 | | |
| Broker's Commission forwarding, | 4 | 3 | 0 | | |
| | 62 | 9 | 6 | | |
| Commission 5 per cent. | 3 | 2 | 6 | | |
| | | | 65 | 12 | 0 |
| Insurance on the Mary and Susan. Amount and premium covered by £1300, at 2 1-2 guineas per cent. and policy 78 shillings, | 38 | 0 | 0 | | |
| Commission for effecting insurance at 1-2 per cent. | 6 | 10 | 0 | | |
| | | | 44 | 10 | 6 |
| | | | £ 1203 | 4 | 6 |

|  | Am't brought forward, | £ 1203 | 4 | 6 |
|---|---|---|---|---|
| Canal insurance to Liverpool 1-2 per ct. on £1041 0 11 1-2 | | 5 | 4 | 0 |
| Insurance against fire, | | 6 | 15 | 0 |
| Warehouse rent in Liverpool, | | 15 | 0 | 0 |
| Twelve months Interest on £1041 0 11 1-2 at 5 per cent. | | 52 | 1 | 0 |
|  |  | 79 | 0 | 0 |
|  |  | £ 1282 | 4 | 6 " |

1816.

The Mary and Susan.

2. A bill of lading in the usual form, stating that the goods were shipped by Thomas and William Earle & Co. of Liverpool, to be delivered to the claimants, or to their assigns, in New-York. 3. The two following letters:

*"Birmingham, 8th July,* 1812.

" Messrs. G. & H. VAN WAGENEN.

"GENTLEMEN,

"In consequence of the revocation of the British Orders in Council, on the first day of August next, we have lost no time in shipping the goods sent to Liverpool so long since, agreeable to your kind order. They are in the Mary and Susan, a most beautiful new vessel, to sail in all this week; the freights are very high, 70*s.* for measurement to New-York, and 80*s.* to Philadelphia, and at this moment nothing less will be taken. We, therefore, thought you would prefer to have the goods at this rate, rather than wait for a reduction in the freight, which, we doubt not, will soon take place. By the letter of our friends, Messrs. Spooner, Attwood & Co., herewith, you will perceive the interruption to commerce has been an inconvenience to us as young merchants; but the unneighbourly conduct of the old house will only serve to prompt us to new exertion for our friends in the States, for whose interest nothing shall be omitted within our power. We shall certainly serve them as well, if not on better terms, than heretofore. We will not be undersold. In a few days we shall send Mr. Oakley, for the use of our friends, a new and complete set of patterns, which, we trust, will meet with their approbation. Mr. O. and Messrs. B. W. Rogers & Co. will be able to give you more particulars respecting what has passed on this side. The amount of invoice herewith to your debt is 820*l.* 2*s.* 1*d.*, which, agreeable to the letter of Messrs. Spooner, Attwood & Co. you will please to remit to them on arrival of the goods;

but hereafter things will move in the usual channel.  Waiting your fur-
ther favours,

" *We remain, Gentlemen, your most obedient servants,*

" DANIEL CROSS & Co."

" *Birmingham, 9th July,* 1812.

" Messrs. G. & H. Van Wagenen, Merchants, New-York

" Gentlemen,

" In consequence of the late unfortunate state of affairs between this
country and the United States of America, great inconvenience and
distress have naturally been experienced by the merchants and manu-
facturers here.  Among others, our friends Messrs. Daniel Cross &
Co. have been considerably embarrassed, and have received great re-
lief and assistance from our house.  We were induced to extend this
assistance, as bankers, from motives of friendship and regard, and
under the hope that the unnatural state of affairs between the two
countries could not possibly last long ; but as it was necessary that our
assistance should be very considerable, we thought it right to obtain
from them an assignment of certain quantities of goods which they had
provided on account of your house, and of several others in the United
States, previous to the 2d of February, 1811.  We are thus introduced
to your acquaintance, and we beg leave to send you herewith an in-
voice of the goods which Messrs. Daniel Cross & Co. had purchas-
ed for your account, and which are now forwarded to you, requesting
that you will remit the amount, 820*l.* 2*s.* 2*d., to us* at your earliest con-
venience.  We cannot conclude this letter without expressing our
satisfaction at the services we have had the opportunity of rendering
to Messrs. Daniel Cross & Co., whom we consider to be persons of the
greatest integrity and knowledge of business, and without earnestly
recommending them to your future attention.  We are convinced
that their late difficulties will not at all affect their future proceedings,
and that they will henceforth be enabled to carry on their business in
the same regular and punctual way as they have formerly done ; and
we cannot but flatter ourselves, that as the orders in council are now
revoked, and the British government has become alive to the true
interest of the British people, the natural relations between the two
countries will long continue, and that the connexion between your
respectable house and Messrs. Daniel Cross & Co. will be produc-
tive of permanent and mutual advantages.  With best wishes for your
prosperity and happiness, and that of your country,

" *We are, respectfully, Gentlemen, your obedient humble servants,*

" SPOONÉR, ATTWOOD & Co. *Bankers, Birmingham,*

" Messrs. G. & H. Van Wagenen, Merchants, New-York."

*Hoffman*, for the appellants and captors. 1st. Probably a delivery from Cross & Co. to the ship master would have been, in contemplation of law, a delivery to the claimants. But Attwood & Co. were the shippers, between whom and the claimants there was no privity. There is no proof that Cross & Co. ever accepted the order or commission sent to them by the claimants. There was a sale and delivery of the goods from Cross & Co. to Attwood & Co., and the order was executed by strangers to the claimants. Could any action have been maintained by the claimants against Attwood & Co.? None could have been maintained, even against Cross & Co. Possibly, if they had agreed to accept the commission, a special action on the case might have been brought against them as factors. But by the assignment to the bankers they disabled themselves from executing the order. The bankers did not acquire the mere *lien;* they would not have been secure without the absolute dominion of property. They were not obliged to ship, nor the claimants to receive. Both parties might, or not, according to their interest. Suppose the goods had been lost in their transit, could Attwood & Co. have maintained an action for the price against the consignees? I anticipate the unanimous answer of the court in the negative. Suppose the goods should be condemned as prize of war, could the bankers recover against the claimants? No! neither in consequence of a physical nor a legal loss. The case of Dunham & Randolph[a] is conclusive of the present. Attwood

1816.

The Mary and Susan.

a Case of the Frances, Feb. Term, 1814, and 1815.

& Co. exercised acts of ownership on the goods after the transfer to them, and until the lading on board. The claimants could not have received the goods without paying Atwood & Co. They may have had an interest in paying Cross & Co., their correspondents; who may have had their funds in possession—who may have been their debtors. They had an election precisely as the claimants in the Frances had.

*Dexter*, for the respondents and claimants. The possession of the goods was continued in Cross & Co. by their agents at Liverpool, Earl & Co., who shipped as *their*, and, consequently, as *our* agents, on board a general ship, to us, for our account and risk. When the goods were first put in motion, their transit to New-York began, and they were, in effect, delivered to the consignees at that port. Some act of the correspondent in Europe may be necessary to show that he elects to consider the goods, after being purchased of the manufacturer, as the property of the merchant in America. But such an act existed in this case; and the property changed when the goods were delivered to the common carrier on the canal from Birmingham to Liverpool, *i. e.* in 1811. The carrier was the bailee of the consignees in law, and the goods were at their risk from that time. It may be true that the bankers cannot maintain a suit against us; but it may be true that the property, nevertheless, vests in us. The only doubt whether such a suit could be maintained, is, that the debt due to Cross & Co. being a chose in action, could not be transferred. Still, the right to it subsists in them,

who may sue the claimants on account of the advances made by order from them. It is, therefore, immaterial which of the two parties in England may maintain the action. Except for the intervention of the capture and prize proceedings, the goods are delivered, and the claimants are debtors for the price. A bill of lading drawn in consequence of an order to ship goods, transfers the property to the consignee. There is no copy of what is termed the assignment; but it is easy to see that its object was not to defeat the arrangement, or the subsisting relations of creditor and debtor between Cross & Co. and the claimants; but merely to enable the bankers to receive their money from the consignees. Either the assignment was a sale, or a mere naked authority to receive payment from the claimants. If a sale, then was it invalid for want of delivery; if an authority only, then the right of property remains where it was, though it is possible the bankers would have been entitled, in equity, to receive the money. The expression in the heading of the invoice, " which goods are now the property of Messrs. Spooner, Attwood & Co," only proves them to be bad lawyers and bad logicians. Probably they are ignorant of the distinction between general and special property. The *res gestæ* do not warrant a pretension of general property in them, and we deny the conclusion they have drawn. Nothing passed but a right to receive the price of the goods. They had not even a lien, or other legal right, because they never had the possession ; and, in whatever way they might have enforced their claim, they meant nothing more by it than a

confident expectation, founded on mercantile cour-
tesy, that the claimants would pay them.  The ori-
ginal arrangement was to subsist, and Cross & Co.
were, in fact, the shippers.  Even supposing they
have not fulfilled our order literally and strictly; sup-
pose a right of election in the consignees to receive
or reject the goods; are we not to wait for this elec-
tion? Can they lose the property before this election
is made? An irregularity or defect in the execution
of their order may give them a right of action against
their correspondents in a court of municipal law for
damages; but if the rule of the prize court be, that
the property must be vested in the claimants at the
time of shipment, they are entitled to rest ution in
the present case.

*Pinkney*, for the appellants and captors, in reply.
The question is, in whom did the property vest at the
time of shipment, or at the time of capture? The
claimants could not make an efficacious election after
capture, because the rights of the captors interposed
before any election could be made.  If these rights
had not thus interposed, then the power of election
might be exerted.  Therefore, the question stated
is the only controversy in the cause.  Take the
transaction by its stages; break it up into its con-
stituent parts: at what epoch—through the instru-
mentality of what circumstances, did the property pass
to the claimants? If it did not so pass, it was, on the
ocean, the property of an enemy, and, therefore, liable
to capture and confiscation.  The orders are not here;
but will the documentary evidence, now before the

court, justify restitution? 1. Did, then, the first pur-
chase vest the property in the claimants? In the Fran-
ces, it was determined, that it had no such effect; and
the doctrine is upheld by all principle and all analogy.
2. The goods were sent to Liverpool, and they still
remained the property of Cross & Co. The delive-
ry in the vehicle on the canal was inland, and prepa-
ratory to the maritime delivery. The agents of Cross
& Co. at the outport were not agents of the claim-
ants, nor liable to them in an action. The claimants
were not bound, nor could they take possession at
this epoch. Suppose Cross & Co. had become bank-
rupt, would the goods have vested in them? or would
they have been obliged to ship? 3. Consider the
legal effect and circumstances of the assignment.
Cross & Co. were the complete proprietors of the
goods, and the present claimants could not have
shown themselves in a court of justice. The parties
considered the transfer to have changed the proper-
ty, and they knew better what they had done than
the court can know. It must, therefore, have been
calculated and adapted to change the property; the
bankers could have had no indemnity otherwise.
They must have had a discretion to dispose of the
goods; and had they become bankrupts, their as-
signees must have had the same discretion. There is
always a *locus penitentiæ* in the vendor before deli-
very; (as to the right of property I mean, not as to
the right of action in the vendee;) the caprice of
the vendor may influence him to change the direction
of the property. Had the right of the claimants
been a vested right, the vendor in England might

have brought an action against them at any stage of
the transaction.    At what epoch could either he or
the bankers have brought such an action ?. The re-
maining question is as to the concurrent acts of both.
Did those acts vest a right to the price in either ? or
was it in the election of the claimants to receive the
commodities?    The intervening assignment to the
bankers sundered the merchants in England from the
claimants; it deprived them of their ability to obey
the original order; all privity of contract between
the principal and agent was gone.    There was no
obligation on the part of Attwood & Co. to ship; no
authority; no power; no right! How is it that the
rights of war on the property are to be defeated? By
showing an authority to ship?    It exists not.    The
question is *stricti juris ;* the claimants are not bound
to acquiesce in the new state of this transaction;
they have an election to do so or not.    Had the
goods arrived without interruption at their port of
destination, the claimants might have accepted them,
and thus adopted the new state of the transaction, and
the new parties to it.    But the rights of war inter-
cept transfer.    The consignees are not liable for the
retrospective charges at the foot of the invoice, un-
less the goods had been shipped by the agent, and
received by the principal.   The usage of trade is,
that the factor always charges these expenses ; were
it otherwise, it would follow that the property would
always be transferred on the first purchase, contrary
to the express authority of the Frances, with which
the present case coincides in principle.

MARSHALL, Ch. J., delivered the opinion of the court, and, after reciting the documentary evidence, proceeded as follows:

Upon these papers it is contended by the captors, that the goods remained the property of Daniel Cross & Co. until the transfer to Spooner, Attwood & Co., when they became the property of the assignees; that this change of property so operates upon the subsequent shipment as to make it a shipment without order, and to leave it in the election of G. & H. Van Wagenen, to accept or reject the goods; and that this right of election is terminated by the intervening right of the captors.

On the part of the claimants it is contended, that their right commenced with the purchase, which was made by their order, and for their account and risk, and was completed when the goods were forwarded to Liverpool: that if this point be determined against them, still the whole transaction evidences an intention to assign the claim of Daniel Cross & Co. to Spooner, Attwood & Co., so as to give them a right to receive the money, but not in any manner to affect the interests of G. & H. Van Wagenen.

Whether Messrs. G. & H. Van Wagenen became the owners of the goods on their being sent from Birmingham to Liverpool, must depend on the orders under which Daniel Cross & Co. acted. If their authority was general to ship to G. & H. Van Wagenen, the goods might, according to the circumstances of the purchase, remain the property of Daniel Cross & Co. until they were delivered to the master of the vessel for the purpose of transporta-

1816.

The Mary
and Susan.

tion. If they were directed to purchase the goods, and to store them in Liverpool as the goods of G. & H. Van Wagenen, to be afterwards shipped to the United States, it appears to the court that the property changed on being sent to Liverpool, and immediately vested in the American merchants for whom they were purchased. The testimony respecting the orders is found in the letter from Daniel Cross & Co. to G. & H. Van Wagenen. The words of that letter which bear particularly on this point are, "In consequence of the revocation of the British Orders in Council, on the first day of August next, we have lost no time in shipping the goods sent to Liverpool so long since, agreeably to your kind order." This language is not equivocal. It imports, in terms not to be misunderstood, that the goods were sent from Birmingham to Liverpool, in consequence of the orders of Messrs. G. & H. Van Wagenen. This letter is addressed to the house which had given the order, and was written without an existing motive for misrepresenting that order. There is certainly nothing in the circumstances of the transaction which would render it probable that the order must be represented in this letter, either carelessly or intentionally, in any manner different from that which was really given. The situation of this country during what has been termed our restrictive system was notoriously such as to render it an object with every importing merchant to use the utmost despatch in bringing in his goods so soon as they should be legally admissible. Nothing, therefore, can be more probable than that orders for making purchases

which were to be executed at an inland place, by a house residing at such place, would be accompanied with orders directing them to be conveyed to a seaport, there to be held in perfect readiness for exportation. In the usual course of trade, if the purchasing and shipping merchant be the same, there would rarely be any actual change of property between the purchase and the shipment of the articles, nor could we expect to find any extrinsic evidence of ownership, other than the mere possession; but in the state of trade which existed at the time of this transaction, such change, and the evidence of it, may be reasonably expected. In the common state of things, the whole order respecting purchase and shipment, where the same agent is employed, is executed with expedition, and is, in appearance, one transaction. In the actual state of things, the purchase was to be made immediately, but the shipment was to take place at some future indefinite period. It would depend on an event which might be very near or very remote. It became a divided transaction, or, rather, two distinct operations. We look for some intervening evidence of ownership in the person for whom the purchase was made, and are not surprised at finding it. If, in such a state of things, the goods were procured under a general order to purchase, but not to ship until some future uncertain event should occur, and were, in the mean time, to remain the property, and at the risk of the agent, they would probably be retained at the place of purchase under his immediate control and inspection. Their conveynce to a seaport, there to be stored until their im-

portation into the United States should be allowed, was such a fact as would scarcely have taken place without special orders, in the course of which an actual investment of the property in the person by whose order, and for whose use, the goods were purchased and stored at a seaport, is not unreasonably to be expected.  The court considers this letter, then, as proving incontestibly that the goods were conveyed to Liverpool, and there stored, to be shipped on the happening of some future event which it was supposed would restore the commercial intercourse between the two countries, in pursuance of specific orders from the claimants; and is further of opinion, that the transaction itself furnishes strong intrinsic evidence that the goods, when stored in Liverpool, were the goods of the claimants, subject to that control over them which Daniel Cross & Co. would have as the purchasers, and intended shippers, who had advanced the money with which they were purchased.  However this control and lien might be used for their own security, it could not be wantonly used to the destruction of the property of G. & H. Van Wagenen, and any conveyance to a person having notice of their rights ought to operate, and be considered as intended to operate, consistently with them, so far as the two rights could consist with each other.  The words, then, in the invoice, which represent the goods as the property of Spooner, Attwood & Co., are introduced with no other object than to secure the payment of the purchase money to them. The invoice made out by Spooner, Attwood & Co. themselves, states the merchandise it specifies to have

been purchased by Daniel Cross & Co., by order, and

on account and risk of Messrs. G. & H. Van Wagenen, and to have been forwarded to Liverpool more than 12 months anterior to the date of the shipment. Goods thus purchased, and thus conveyed to a seaport, and stored under the orders of the American merchant, may well be considered as leaving in the purchasing agent only the lien which a factor has to secure the payment of the money which is due to him. If this was the true state of the property at the time of the assignment to Spooner, Attwood & Co., they having full notice that the assignment could only operate as an order for G. & H. Van Wagenen to pay the money to them, (Spooner, Attwood & Co.) and would, probably, in its form and expressions, manifest this idea.

The court is much inclined to the opinion, that these goods became the property of the claimants on being stored in Liverpool, if not at an antecedent time. The question, however, would, undoubtedly, be affected by the order under which Daniel Cross & Co. acted; by the deed of assignment to Spooner, Attwood & Co.; and by other papers which are attainable. If, therefore, the case depended entirely upon this point, farther proof might be required. But, in the opinion of the majority of the court, the case does not depend on this point alone.

If the goods were shipped in pursuance of the orders given by G. & H. Van Wagenen, the delivery on board the ship was a delivery to them; the property was vested in them by that act, and they had no election to accept or reject it.

In pursuing this inquiry, the legal effect of the transaction must depend, in a considerable degree, on the intent of the parties, and that intent is, in this case, to be collected chiefly from their letters, and from the circumstances in which they stood. G. & H. Van Wagenen were American merchants desirous of receiving the goods they had ordered as soon as the importation of those goods should be allowed. Daniel Cross & Co. were commission merchants of Birmingham, engaged in the American business. Spooner, Attwood & Co. were bankers, friendly to Daniel Cross & Co.; were desirous of promoting their interests, and recommending them to business, and had advanced them money while embarrassed by the difficulties consequent on the state of trade between the United States and Great Britain. Spooner, Attwood & Co. were desirous, not of purchasing the goods stored at Liverpool by Cross & Co. for the claimants; not of interrupting the shipment of those goods, or the connexion between Daniel Cross & Co. and G. & H. Van Wagenen; but of permitting the shipment to proceed, and of receiving, themselves, the money to which Cross & Co. were entitled. Such was the situation, and such the objects of all the parties: keeping this situation and these objects in view, let the testimony be examined. The letter of Daniel Cross & Co., dated the 8th of July, 1812, is in the language of men who were themselves the shippers of the goods. "We have lost no time," they say, "in shipping the goods, sent to Liverpool so long since, agreeably to your kind order." They speak of the vessel and of the freight,

as if the vessel were selected, and the contract made, by themselves. " We thought you would prefer to have the goods at this rate, rather than wait for a reduction in the freight." They next refer to the letter of their friends, Spooner, Attwood & Co., to show the inconvenience they had sustained as young merchants, but without any indication of an interference of that house in the shipment, and conclude with saying, " the amount of invoice, herewith, to your debit, is 820*l.* 2*s.* 1*d.*, which, agreeably to the letter of Spooner, Attwood & Co., you will please to remit to them on arrival of the goods." This is the letter of an agent who has executed, completely, the order which had been given him; but who, having been compelled to borrow money, had transferred his pecuniary claims to his creditor. The letter of Spooner, Attwood & Co. will next be considered. It is dated the day after that written by Daniel Cross & Co. After stating their friendship for Daniel Cross & Co., and the aid afforded that house, they add : " but as it was necessary that our assistance should be very considerable, we thought it right to obtain from them an assignment of certain quantities of goods which they had provided on account of your house, and of several others in the United States, previous to the 2d of February, 1811. We are thus introduced to your acquaintance, and we beg leave to send you herewith an invoice of the goods Daniel Cross & Co. had purchased for your account, and which we now forward to you, requesting that you will remit the amount of 820*l.* 2*s.* 1*d.* to us at your earliest con-

1816.

The Mary and Susan.

venience." Nothing is said in this letter respecting the vessel by which the goods were sent; nothing indicating the exercise of any judgment by Spooner, Attwood & Co., respecting the time or manner of sending them; nor any thing which would lead to the opinion that they interfered, in any manner whatever, in the transaction of the business. On comparing the two letters, the inference is inevitable, that Daniel Cross & Co. continued to execute the order of G. & H. Van Wagenen, in like manner as if their affairs had never been embarrassed. The contents of the two letters, in conformity with the situation and views of the parties, prove, that Daniel Cross & Co. had only transferred to Spooner, Attwood & Co. their right to receive payment for the goods, and that the arrangements between them were intended only to secure that object. The assignment of the goods mentioned in the letter of Spooner, Attwood & Co. does not appear from the context, and from the nature of the transaction, to be intended to convey the idea of a sale, but to be used in rather a different sense, as an assignment of the adventure, or of the right to the debt due from G. & H. Van Wagenen. Whatever may have been the form of this assignment, it is apparent that it could not have been made, and certainly was not made, with the intention of enabling Spooner, Attwood & Co. to defeat the shipment to G. & H. Van Wagenen, or to control the proceedings of Daniel Cross & Co., under the order they had received. Why, then, are the goods, when put on board the Mary and Susan, in pursuance of the orders of the claim-

ants, to be considered not their property, but as the property of Spooner, Attwood & Co.? It is said that they were shipped by Spooner, Attwood & Co., not by Daniel Cross & Co.; that the confidence implied in the order for purchase and shipment was personal, and could not be transferred or executed by another. Allow to this argument all the weight which is claimed for it by the counsel for the captors; what part of this personal trust was transferred? What part of the order was executed by any other than Daniel Cross & Co.? The goods were purchased, sent to Liverpool, stored, and, afterwards, shipped by them. Every other auxiliary part of the transaction was performed by them. Nothing appears to have been done in pursuance of orders from Spooner, Attwood & Co., but every thing in pursuance of their own judgment, acting under the order received from G. & H. Van Wagenen. On this ground the claimants could raise no objections to the conduct of Daniel Cross & Co. But it is said, that Daniel Cross & Co. might have had the funds of G. & H. Van Wagenen in their hands, in which case the claimants would have been compelled, by receiving the goods, to pay their amount to Spooner, Attwood & Co.; consequently, this assignment must be considered as creating in Spooner, Attwood & Co. new rights, which released G. & H. Van Wagenen from the obligation to receive the cargo. But Daniel Cross & Co. did not purchase with the funds of the claimants. They purchased with their own funds. They inflicted, therefore, no injury on the claimants by transferring their right to the mo-

ney to Spooner, Attwood & Co. The effect of the transaction is precisely the same as if they had drawn a bill in favour of Spooner, Attwood & Co. for the amount of the invoice. It is said that the assignment gave Spooner, Attwood & Co. an election to ship the goods, or to dispose of them otherwise, and that the necessary consequence of this power of election, is a correspondent right of election in G. & H. Van Wagenen to receive or reject them. The court does not view the transaction in this light. The assignment to Spooner, Attwood & Co. is understood by the court, from the evidence furnished by the letters, and the circumstances and objects of the parties, to have been subject to the right of Daniel Cross & Co. to execute, completely, the order of the claimants. The interests of all parties were best promoted by pursuing this course, and they appear to have pursued it. The court perceives nothing which can justify the opinion that Spooner, Attwood & Co. had a right, or would have been permitted, to intercept the shipment. Certainly it was neither their wish nor their interest to interrupt it. It is not reasonable, therefore, to suppose, that they would have created any difficulty in obtaining a right to claim the amount of the invoice from G. & H. Van Wagenen, by insisting on such an assignment as Daniel Cross & Co. would have been unwilling to make, because it might have proved injurious to them, without benefiting the house they meant to secure. It has also been argued, that the orders most probably directed a shipment of the goods when the non-intercourse should be removed,

and that a shipment before that time was without
orders, and at the risk of the shipper. The court does
not think this probable. It is well known that the
continuance of the laws of non-intercourse was consi-
dered as depending on the continuance of the orders
in council. It is, also, perfectly clear, that the Ame-
rican merchant, who should permit his goods to re-
main in Great Britain until intelligence of the repeal
of the non-intercourse laws could be conveyed from
this country to that, would be anticipated by all
others, and would bring them to a market already
supplied. Nothing, therefore, would be more rea-
sonable than to order them to be shipped on the re-
vocation of the orders in council. This idea is sup-
ported by the letter of Daniel Cross & Co. That
letter indicates no doubt of the propriety of the
shipment.

Upon a view of the whole case, the majority of
the court is of opinion, that this is not a case in
which farther proof ought to be required, and that
the goods by the Mary and Susan were shipped in
pursuance of the orders of the claimants, and be-
came their property when delivered, for their use, to
the master of the vessel, if not at an earlier period.

Sentence of the circuit court affirmed with costs.