### UNITED STATES ex rel. BRODY v. HECHT, U. S. Marshal.

(Circuit Court of Appeals, Second Circuit. February 8, 1926.)

No. 199.

**1. Criminal law ☞242.(8).**

Under Rev. St. § 1014 (Comp. St. § 1674), providing for removal of offenders to district where trial is had, duties of district judge are judicial.

**2. Criminal law ☞242(8)—District judge must issue warrant for removal of defendant, either if each of things required by removal statute is clearly established or if as to some of them he merely entertains doubts as to establishment thereof (Rev. St. § 1014 [Comp. St. § 1674]).**

District Judge, before issuing warrant for defendants' removal under Rev. St. § 1014 (Comp. St. § 1674), must consider whether indictment charges an offense against United States, identity of person whose removal is sought with party indicted, whether court of district to which he is to be removed has jurisdiction to try him for offense charged, and whether there is probable cause to believe that defendant has committed offense with which he is charged, and if each of such things is either clearly established, or if as to some of them judge merely entertains doubts as to establishment thereof, he must issue warrant for removal of defendant.

**3. Extradition ☞35—Habeas corpus ☞92(2) —Question whether person demanded is fugitive is for determination of Governor of state on which demand is made, and warrant of arrest issued by him stands in habeas corpus unless clearly overthrown.**

In interstate rendition proceedings question whether person demanded is fugitive from justice of demanding state is for determination of Governor of state on which demand is made, and if he issues a warrant of arrest it must stand in habeas corpus proceeding, unless clearly overthrown.

**4. Criminal law ☞242(5)—Fact of indictment is not necessarily conclusive in removal proceeding.**

If an indictment is filed in District Court of United States, and person indicted is found in another state and arrested therein, and proceedings are instituted for his removal to district in which indictment was found, so that he may be tried thereon, fact of indictment is not necessarily conclusive.

**5. Criminal law ☞242(1)—Accused cannot be. tried in one district on indictment showing commission of offense in another; removal to district other than one in which Constitution permits trial to be had is unauthorized (Const. Amend. 6; Const. art. 3, § 2).**

Under Const. Amend. 6 and Const. art. 3, § 2, accused cannot be tried in one district on an indictment showing that offense was not committed therein, and removal to district other than one in which Constitution permits trial to be had is unauthorized.

**6. Criminal law ☞242(5)—Federal judge should not consent to warrant of removal to another district solely on strength of indictment (Rev. St. § 1014 [Comp. St. § 1674]).**

Federal judge to whom an application for warrant of removal is made, under Rev. St. § 1014 (Comp. St. § 1674), should not consent to removal to another district solely on strength of indictment, if it appears that offense was not committed in district in which indictment was found.

**7. Criminal law ☞242(5).**

Indictment found in district to which removal is sought makes prima facie case for removal.

**8. Criminal law ☞242(6)—Habeas corpus ☞ 92(1)—District Court should be satisfied in removal proceedings that indictment charges offense against United States, but, if sufficiency of indictment is merely doubtful, inquiry on habeas corpus not open.**

In removal proceedings, District Court should be satisfied that on face of indictment an offense against United States is charged; but defendant may be discharged if it appears that indictment is essentially and fundamentally defective, but, if there is a mere doubt as to its sufficiency, inquiry on habeas corpus is not open.

**9. Criminal law ☞242(8)—Disputed questions of fact or law cannot be decided by court in which removal proceeding is heard.**

In removal proceeding, disputed questions of fact or law must be left to determination of court, where indictment is found, and cannot be decided by court in which removal proceeding is heard.

**10. Sales ☞201(4)—Delivery of goods to carrier designated by purchaser for transportation is sufficient to pass title in goods.**

Delivery of goods to carrier designated by purchaser is sufficient to pass title in goods, where they are consigned so as to confer on buyer right to receive them from carrier without reservation.

**11. Sales ☞202(5)—Title to narcotics passed to buyer, where seller delivered same to carrier and received purchase price, and nothing more remained to be done (Uniform Sales Act, §§ 18, 19, rules 1, 4 [Laws N. Y. 1911, c, 571, §§ 99, 100]).**

Title to narcotics passed to buyer, in view of Uniform Sales Act, §§ 18, 19, rules 1 and 4 (Laws N. Y. 1911, c. 571, §§ 99, 100) when seller delivered same to carrier and re-

ceived purchase price, and nothing more remained to be done to complete transaction.

**12. Criminal law ⊂⇒242(7).**

Government can offer testimony in support of indictment in removal proceedings.

**13. Criminal law ⊂⇒242(7)—Removal of defendant to district where indictment was found held not justified by evidence as to place of crime (Harrison Narcotic Act).**

Removal of defendant for violation of Harrison Narcotic Act (Comp. St. §§ 6287g–6287q), as amended by Act Feb. 24, 1919 (Comp. St. Ann. Supp. 1919, Comp. St. Ann. Supp. 1923, § 6287g), to district where indictment was found, *held* not justified by evidence as to place where crime was committed.

Appeal from the District Court of the United States for the Southern District of New York.

Application for habeas corpus by the United States, on the relation of Hyman Brody, against William C. Hecht, as United States Marshal, etc. From an order sustaining writ, defendant appeals. Affirmed.

Emory R. Buckner, U. S. Atty., of New York City (Thomas T. Cooke, Asst. U. S. Atty., of New York City, of counsel), for appellant.

Wahle, Gilbert & Black, of New York City (Chas. G. F. Wahle, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MACK, Circuit Judges.

ROGERS, Circuit Judge. It appears that Hyman Brody, with one Harry Drew, were indicted by a federal grand jury in Kansas City, Missouri, sitting in the Western district of the state of Missouri. The indictment was filed on June 1, 1925. It charged that Hyman Brody and one Harry Drew were "then and there" within the jurisdiction of that court, and were then and there dealers in opium and its derivatives. It charged that they "then and there" unlawfully, willfully, knowingly, and feloniously violated in the particulars therein stated an Act of Congress of December 17, 1914 (Comp St. §§ 6287g–6287q), as amended February 24, 1919 (Comp. St. Ann. Supp. 1919, Comp. St. Ann. Supp. 1923, § 6287g), and under Act May 26, 1922 (Comp. St. Ann. Supp. 1923, §§ 8800–8801g).

The act involved is known as the Harrison or Anti-Narcotic Act. 38 Stat. p. 785, c. 1. The act requires every person who "deals in, dispenses, sells, distributes, or gives away opium or coca leaves or any compound, manufacture, salt, derivative, or preparation thereof," to register with the

11 F.(2d)—9

collector of internal revenue of the district, his name, place of business, and the place where such business is to be carried on; and at the time of registry he is required to pay and on or before the 1st day of the month specified annually thereafter to the collector a special tax at a specified rate per annum; and it is made unlawful for any one required to register under the terms of the act to deal in any of the aforesaid drugs without having registered and paid the tax as provided in the act.

It is also declared to be unlawful to sell, barter, exchange, or give away any of the aforesaid drugs, except in the manner and under the conditions specified in the act. The constitutionality of the statute has been sustained. United States v. Brown (D. C.) 224 F. 135; U. S. v. Woods (D. C.) 224 F. 278; United States v. Charter (D. C.) 227 F. 331; United States v. Wong Sing, 260 U. S. 18, 21, 43 S. Ct. 7, 67 L. Ed. 105; United States v. Doremus, 249 U. S. 86, 39 S. Ct. 214, 63 L. Ed. 493. And see Jin Fucy Moy v. United States, 254 U. S. 189, 41 S. Ct. 98, 65 L. Ed. 214.

On June 5, 1925, a narcotic agent in charge of the office at Kansas City, Missouri, filed a complaint with a United States commissioner in the Southern district of New York, in which he charged Hyman Brody with having unlawfully, willfully and knowingly violated the Harrison Act. The source of his information was a certified copy of a warrant issued by the United States commissioner of the district of Missouri, and it was further alleged that Brody was a fugitive from justice within the Southern district of New York, and he asked for a warrant of arrest and removal to the district of Missouri, there to be dealt with according to law.

Thereupon Brody was taken into custody, brought before the commissioner, and hearings were had commencing on June 11, 1925. At this hearing the government offered in evidence the certified copy of the indictment, and then proceeded to call four witnesses, two being narcotic agents of the government, the United States attorney for the district of Missouri, and one Max Bernstein, who had acted as a "stool pigeon" for the government, and was named in the indictment as the person to whom Brody had made two unlawful sales of narcotics in Kansas City, Missouri.

Brody himself did not testify, and no witnesses were sworn on his behalf, and the case is to be disposed of on the indictment and the testimony introduced by the government.

Before proceeding to the consideration of

their testimony, it is important to set forth the indictment, which is the ground upon which these proceedings rest.

The first count charged that Hyman Brody on May 21, 1925, at *Kansas City, Missouri,* was a dealer in opium and its derivatives, and as such, being required to register as such dealer under the laws of the United States, then and there unlawfully, willfully, knowingly, and in violation of the Act of Congress and the amendments thereto, *possessed* for sale and distribution 10 ounces of morphine without having registered or paid the tax.

The second count charged that on May 21, 1925, at *Kansas City, Missouri,* Hyman Brody feloniously *sold* to Max Bernstein 10 ounces of morphine.

The third count charged that on May 21, 1925, Brody *purchased* at *Kansas City, Missouri,* from a party or parties to the grand jurors unknown, 10 ounces of morphine, the same not being in or from the original stamped package.

The fourth count charged that on June 21, 1925, at *Kansas City, Missouri,* Brody *possessed "for sale and distribution"* 40 ounces of morphine, contrary to the provisions of the statute.

The fifth count charged that on June 1, 1925, at *Kansas City,* Brody feloniously *sold* to Max Bernstein 40 ounces of morphine.

The sixth count charged that on June 1, 1925, Brody feloniously purchased at *Kansas City, Missouri,* from a party or parties unknown to the grand jurors, 40 ounces of morphine.

The seventh and last count charged that Brody on May 30, 1925, feloniously facilitated the transportation of 40 ounces of morphine from New York City to Kansas City, Missouri, by consigning and shipping it to Max Bernstein at Kansas City, after the same had been unlawfully imported into the United States, the said Brody then and there well knowing that it had been imported contrary to law.

This brings us to a consideration of the testimony adduced at the hearing.

One of the narcotic agents from Kansas City, Missouri, testified that he had not spoken to Brody, or seen him, until May 29, 1925, when he saw him in New York City getting into his automobile. The first conversation was on June 4, 1925, and in that conversation the man told him he was Hyman Brody. That was the extent of his testimony, and it was evidently for the purpose of establishing identity.

The second narcotic agent was also from Kansas City, Missouri. He testified to having seen Brody in New York City on May 29 and on June 4. He had never spoken to Brody until June 4, when he called upon him in his office in New York. He detailed a long conversation he had with him, in which the witness stated that he was a friend of Max Bernstein (with whom Brody had dealt), and that he wanted to buy some morphine. They discussed how the matter could be best handled to avoid suspicion and detection. Then he testified as follows:

"He (Brody) said, 'You just deal in morphine?' I said, 'Yes.' Then he said, 'I will say $22 a yard or feet, or anything, and you will know what I mean.' I said, 'All right.' Then I said, 'Supposing I want to get a small amount by express?' He said, 'I don't deal in small amounts.' He said, 'That ten ounces I sent Max, I done that as an accommodation.'

"Q. Did he say who Max was? A. Bernstein; we were talking about Bernstein. He said, 'Max just called me up from Kansas, on the long distance, and he said to have ten ounces, and I shipped it to him by express as an accommodation.' I said, 'All right, I am going home; when I get ready to buy some stuff, I will send you a wire.' "

Then the record shows that counsel for Brody called attention to the fact that the indictment contained no conspiracy count, but charged substantive crimes committed in Kansas City, and that the conversation testified to had no probative force in New York City. He said:

"You cannot send a man from here to Kansas City on an indictment which charges him with having committed grand larceny in Kansas City on the 21st of May, or the 30th of May, or on the 1st of June, perforce because of a conversation which is had on the 4th of June, in which he agrees to commit another burglary there some time in the future."

The United States attorney from the district of Missouri thereupon said:

"I think a portion of the conversation did relate to future things, but a very important part of it constituted admissions as to past occurrences, being the identical occurrences set out in the indictment. For instance, this defendant, Brody, in the course of his conversation with Mr. Koehn, referred to a 10-ounce shipment to Max Bernstein. Now, that is what the first count is based on, a 10-ounce shipment made to Kansas City, and the sale and delivery being in Kansas

City, and of course fixing the jurisdiction there, and his reference to the price of $22 an ounce, which had been made to Max, refers to the 40-ounce shipment which the indictment sets forth was delivered in Kansas City. It has nothing to do with future occurrences, but the conversation which started out on future occurrences developed into these admissions by the defendant Brody, not that the government has to prove on this proceeding the details of these occurrences, but merely for the purpose of fastening identification on this man, to show there is no mistake that this is the Brody who is engaged in the narcotic business, and this is the Brody who is shipping in quantities to Max Bernstein, for the purpose of foreclosing beyond all question the point of mistaken identity."

This shows that the testimony as to the sale to Max Bernstein of 10 ounces of morphine charged in the second count, and the purchase by Brody of 10 ounces charged in the third count, and the 40 ounces referred to in the fourth count, the fifth, the sixth, and seventh counts, relate to the sale and possession of the morphine testified to in the testimony given by the narcotic agent above set forth, and that is now to be set forth in the testimony of Max Bernstein himself.

Bernstein testified in part as follows:

"Q. Did you ever talk to Brody face to face? A. Yes, sir.

"Q. Where? A. In his office.

"Q. Where? A. 309 West Forty-Seventh street, New York City.

"Q. Ever talk to him in Kansas City face to face? A. No, sir.

"Q. Ever see him in Kansas City? A. No, sir.

"Q. When was it you had a conversation with him face to face? A. Well, here, about a week ago. * * *

"Q. Did you during the month of May have a telephone conversation, after this letter you wrote to him and after this telegram, without stating what they were—did you have a long-distance conversation with Mr. Brody? A. I did.

"Q. State the substance of the conversation. * * *

"Q. Go on and relate the substance of the conversation on the telephone. A. When I called up Brody, on the phone, I asked him if he had any merchandise. He said, 'Yes,' he had some, and I told him I needed ten pieces right away, and he said the price had advanced since he had wired me the telegram. The price is now $20 an ounce, instead of $17 an ounce, and I said, 'Well, I have to

have 10 ounces immediately; will you send me it down by express?' He said, 'Are you sure you can get it?' I said, 'Yes; I can get it; I will take chances on getting it that way.' He said, 'All right.' So I went to the telegraph office and wired him $200; that was the result of that conversation.

"Q. Subsequently, what, if anything, did you receive by express? A. I received a weed suitcase with 10 ounces of morphine in it.

"Q. Were other persons present when that was opened? A. Yes, sir.

"Q. And then did you have any further conversation over the telephone with Mr. Brody later? A. I did.

"Q. Just state, as near as you can. A. I don't remember exactly, but five or six days afterwards I called Mr. Brody again on the telephone, long-distance, and told him the package had not arrived as yet. He said, 'Well, that is funny.' He said that he sent it out himself. I said, 'Well, it hadn't got here yet.' He said, 'Well, I took it to the express company and expressed it, and it should be there.' I told him at the time that I expected to be in New York soon, and would want to buy quite a number of pieces of merchandise.

"The Commissioner: As a matter of fact, had the goods arrived?

"The Witness: At that time; yes, sir.

"The Commissioner: And you told him it had not arrived?

"The Witness: Yes, sir.

"Q. There was some other person listened in? A. Yes; several people listened in on the conversation.

"Q. The purpose was to get him to make this statement? A. The purpose was to get Brody to admit that he sent the merchandise.

"Q. Did you thereafter come on to New York and have further negotiations with him with reference to the larger quantity? A. Yes, sir.

"Q. Just state, in substance, what took place in that regard. A. I went to Mr. Brody's office and asked him if I could get some merchandise. He said, 'Yes.' I bought from him 40 ounces of morphine, and paid him $22 an ounce. * * *

"Q. Is this the Brody who is sitting over there, the Brody you had the conversation with, and the Brody you had your dealings with? A. Yes, sir.

"Q. In reference to these 10 ounces? A. Yes, sir.

"Q. And also the larger amount later on? A. Yes, sir.

"Q. And what part did Mr. Drew have in this later transaction? A. In the later transaction, when I came up to the office to purchase the 40 ounces, why, I handed the money to Mr. Brody, and he gave it to Mr. Drew, the money, and told Drew to get the merchandise and put it in a trunk for him, and have it shipped to Kansas City.

"Q. In what way was that sent to Kansas City? A. In a trunk. It was checked through in a trunk as baggage.

"Q. Who had looked after the check? A. A Mr. Drew.

"Q. The man sitting there (indicating Drew)? A. Yes, sir.

"Q. And was the check delivered to you? A. Yes, sir.

"Mr. Wahle: By whom?

"The Commissioner: He said, by whom?

"Q. By whom? A. By Mr. Drew.

"Q. Your transaction, your arrangement, was in the presence of Mr. Drew and Mr. Brody, in Mr. Brody's office? A. Yes, sir.

"Q. And he instructed Mr. Drew to do certain things in connection with it? A. Yes, sir.

"Q. In pursuance of those instructions a check was delivered to you for some—

"Mr. Wahle: A trunk check?

"Q. A trunk check? A. Yes, sir.

"Q. What did you do with the trunk check? A. I immediately turned it over to Mr. Forrer (the narcotic agent), who was in the hotel at the time.

"Mr. Wahle: In New York City?

"The Witness: In New York City."

The United States attorney for the district of Missouri testified to going to the railroad station in Kansas City, Missouri, when the trunk was received and delivered on the check which had been given to Bernstein in New York City. He testified to the trunk being opened in his presence, and that it contained 40 boxes—one of which he had in his hand, and the others being similar. He testified also as follows:

"Q. Is there any identification marks on this trunk, showing where shipped from? Did you observe any? A. I expect from the baggage check that it came from New York. The place I received it was Kansas City, Missouri, in the Western district of Missouri, and I presented part of the contents and the checks before the grand jury that returned the indictments that same day."

At the close of the hearing the commissioner reserved his decision, but later, on June 30, 1925, he committed Brody to the custody of the United States marshal until removed to the Western district of Missouri. Thereafter Brody sued out a writ of habeas corpus and a writ of certiorari, and the matter was heard before the District Judge upon the record before the commissioner.

Section 1014 of the Revised Statutes (Comp. St. § 1674) provides that for any crime against the United States, where any offender is committed in any district other than that where the offense is to be tried, it shall be the duty of the judge of the district where such offender is imprisoned seasonably to issue, and of the marshal to execute, a warrant for his removal to the district where the trial is to be had.

When the matter came before the District Judge he sustained the writ and ordered Brody's discharge. This he did on the ground that probable cause had not been shown for his removal to the Western district of Missouri. In his opinion he said:

"The writ must, in my opinion, be sustained. I feel no question about the proof of identity. But while the indictment makes a prima facie case it is clearly met by the government's own evidence and no probable cause is established. Tinsley v. Treat, 205 U. S. 20 [27 S. Ct. 430, 51 L. Ed. 689]. The crime shown by the testimony was wholly committed in the Southern district of New York where both shipments took place, and title to the narcotics passed. Moreover, so far as Brody facilitated the transportation of the morphine he did this at New York where he completely parted with both title and possession."

[1, 2] The duties of a District Judge, acting under section 1014, are not ministerial, but judicial. Before issuing his warrant for the defendant's removal, he must consider four things:

(1) That the indictment charges an offense against the United States.

(2) The identity of the person whose removal is sought with the party indicted.

(3) That the court of the district to which he is to be removed has jurisdiction to try him for the offense charged.

(4) That there is probable cause to believe that he committed the offense with which he is charged.

If the judge is clear that any one or more of these four propositions has not been established, it is his duty to refuse to issue a warrant for defendant's removal. A doubt concerning the establishment of such one or more propositions would not, however, justify such refusal. Therefore, if each of the four propositions is either clearly es-

tablished, or if as to one or more of them the judge merely entertains doubts as to the establishment thereof, it is his duty to issue a warrant for the removal of the defendant, because such doubts, if any, whether as to law or as to fact, are to be resolved in the trial court.

[3] In interstate rendition proceedings the question whether the person demanded is a fugitive from the justice of the demanding state is for the determination of the Governor of the state upon which demand is made. If he issues a warrant of arrest, it must stand in a habeas corpus proceeding "unless clearly overthrown." Hogan v. O'Neil, 255 U. S. 52, 41 S. Ct. 222, 65 L. Ed. 497.

[4] So, if an indictment is filed in a District Court of the United States, and the person indicted is found in another state and arrested therein, and proceedings are instituted for his removal to the district in which the indictment was found, so that he may be tried thereon, the fact of the indictment is not necessarily conclusive.

Article 3, section 2, of the Constitution provides that "the trial of all crimes, except in cases of impeachment, shall be by jury; and·such trial shall be held in the state where the said crimes shall have been committed." [5] The Sixth Amendment to the Constitution of the United States provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed. * * *" As was said by the Supreme Court in Salinger v. Loisel, 265 U. S. 224, 232, 44 S. Ct. 519, 522 (68 L. Ed. 989) : "It must be conceded that under the Sixth Amendment to the Constitution the accused cannot be tried in one district on an indictment showing that the offense was not committed in that district; and it also must be conceded that there is no authority ·for a removal to a district other than one in which the Constitution permits the trial to be had." And the court in the Salinger Case thereupon proceeded to inquire whether it appeared that the offense was not committed in the district to which removal was sought.

In Tinsley v. Treat, 205 U. S. 20, 29, 27 S. Ct. 430, 432 (51 L. Ed. 689) Chief Justice Fuller, writing for the court and commenting on section 1014 of the Revised Statutes, said:

"Obviously the first part of this section provides for the arrest of any offender against the United States wherever found and without reference to whether he has been indicted, but when he has been indicted in a district in another State than the district of arrest, then, after the offender has been committed, it becomes the duty of the District Judge, on inquiry, to issue a warrant of removal. And it has been repeatedly held that in such cases the judge exercises something more than a mere ministerial function, involving no judicial discretion. He must look into the indictment to ascertain whether an offense against the United States is charged, find whether there was probable cause, and determine whether the court to which the accused is sought to be removed has jurisdiction of the same. 'The liberty of the citizen, and his general right to be tried in a tribunal or forum of his domicile, imposes upon the judge the duty of considering and passing upon those questions.' Mr. Justice Jackson, then Circuit Judge, Greene's Case, 52 F. 104. In the language of Mr. Justice Brewer, delivering ·the opinion in Beavers v. Henkel, 194 U. S. 73, 83 [24 S. Ct. 605, 48 L. Ed. 882] : 'It may be conceded that no such removal should be summarily and arbitrarily made. There are risks and burdens attending it which ought not to be needlessly cast upon any individual. These may not be serious in a removal from New York to Brooklyn, but might be if the removal was from San Francisco to New York. And statutory provisions must be interpreted in the light of all that may be done under them. We must never forget that in all controversies, civil or criminal, between the government and an individual, the latter is entitled to reasonable protection. Such seems to have been the purpose of Congress in enacting section 1014, Rev. Stat., which requires that the order of removal be issued by the judge of the district in which the defendant is arrested. In other words, the removal is made a judicial, rather than a mere ministerial, act.' "

In Greene v. Henkel, 183 U. S. 249, 22 S. Ct. 218, 46 L. Ed. 177, the Supreme Court said:

"We do not, however, hold that when an indictment charges no offense against the laws of the United States, and the evidence given [before the commissioner] fails to show any, or if it appear that the offense charged was not committed or triable in the district to which the removal is sought, the court would be justified in ordering the removal, and thus subjecting the defendant to the necessity of making such a defense in the court where the indictment was found. In that case there would be no jurisdiction to commit nor any to order the removal of the prisoner."

In the recent case of Morse v. United States, 267 U. S. 80, 83, 45 S. Ct. 209, 210 (69 L. Ed. 522) Mr. Justice Sutherland, writing for the court and referring to removal proceedings, says:

"The inquiry in such proceedings is whether there is probable cause to believe the prisoner guilty and justify his removal for trial."

[6] And it has been very properly said that a federal judge, to whom an application for a warrant of removal is made under section 1014, "misconceives his duty, and fails to protect the liberty of the citizen," if he consents to the removal to another district solely on the strength of the indictment if it appears that the offense was not committed in the district in which the indictment was found. See Stewart v. United States, 119 F. 89, 93, 55 C. C. A. 641; In re Buell, Fed. Cas. No. 2102; In re Terrell (C. C.) 51 F. 213; United States v. Brawner (D. C.) 7 F. 86; In re Dana (D. C.) 68 F. 886.

In Ireland v. Henkle, 179 F. 993, Judge Lacombe, sitting in the Circuit Court for the Southern District of New York in 1910, sustained writs of habeas corpus and ordered petitioners discharged. They had been indicted in the district of Wyoming for conspiracy to defraud the United States. Proceedings were instituted in New York for their removal to Wyoming. A hearing was had before a United States commissioner. He held that there was probable cause to believe that the petitioners had committed the crime charged in the indictment and committed them for removal to the district of Wyoming. The matter then came before Judge Lacombe upon writs of habeas corpus and certiorari. He sustained the writs and ordered the petitioners discharged, saying:

"If there was any conspiracy in which these petitioners were engaged, that conspiracy was entered into in New York, and they should not be removed to Wyoming upon this record."

[7] It must, however, be admitted that an indictment found in a district to which removal is sought makes a prima facie case for removal. The proposition is indisputable. Bryant v. United States, 167 U. S. 104, 17 S. Ct. 744, 42 L. Ed. 94; Greene v. Henkel, 183 U. S. 249, 22 S. Ct. 218, 46 L. Ed. 177; Hyde v. Shine, 199 U. S. 62, 25 S. Ct. 760, 50 L. Ed. 90; Beavers v. Henkel, 194 U. S. 73, 24 S. Ct. 605, 48 L. Ed. 882; Price v. Henkel, 216 U. S. 488, 491, 30 S. Ct. 257, 54 L. Ed. 581; Haas v. Henkel, 216 U. S. 462, 481, 30 S. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112; Gayon v. McCarthy, 252 U. S. 171, 173, 40 S. Ct. 244, 64 L. Ed. 513; Fitzgerald v. United States (C. C. A.) 6 F.(2d) 156; Magnus v. Keville (C. C. A.) 6 F.(2d) 157; Hawkins v. Borthwick (C. C. A.) 5 F.(2d) 564.

[8] In removal proceedings the District Court should be satisfied that upon the face of the indictment an offense against the United States is charged, but the defendant may be discharged if it appears that it is essentially and fundamentally defective. Littleton v. United States (C. C. A.) 6 F.(2d) 209, 211; Stewart v. United States, 119 F. 89, 55 C. C. A. 641. But if there is mere doubt as to the sufficiency of the indictment inquiry on habeas corpus is not open. Hogan v. O'Neill, 255 U. S. 52, 41 S. Ct. 222, 65 L. Ed. 497.

[9] In this case the sufficiency of the indictment has not been challenged in these proceedings, and we accept it as making out a prima facie case in favor of the removal of Brody to the Western district of Missouri. It must also be admitted that in a removal proceeding, in which there are disputed questions of fact or disputed matters of law, such controverted matters of law or fact must be left for the determination of the court where the indictment was found, and cannot be decided by the court in which the removal proceeding is heard. Henry v. Henkel, 235 U. S. 219, 229, 35 S. Ct. 54, 59 L. Ed. 203; Louie v. United States, 254 U. S. 548, 41 S. Ct. 188, 65 L. Ed. 399; Rodman v. Pothier, 264 U. S. 399, 403, 44 S. Ct. 360, 68 L. Ed. 759.

It is, however, an entirely different matter where in such a proceeding there are no disputed questions of fact or of law, and it clearly appears that the offense charged in the indictment was not committed in the district in which the indictment was found.

The undisputed testimony in this case shows that Brody, in New York, was called by Bernstein, in Kansas City, on the telephone, and asked to send him by express 10 ounces of morphine, and that Brody agreed to do it, and that the package was received by Bernstein in Kansas City, and before it was sent Bernstein had telegraphed him $200, which was the price he had agreed to pay.

The undisputed testimony shows that thereafter Bernstein came to New York City and met Brody in his office, and there bought from him 40 ounces of morphine and paid him $22 an ounce; that it was then and there agreed between the two that Brody was

to have the morphine put into a trunk and checked to Bernstein in Kansas City; that he did so, and when the trunk arrived in Kansas City the agents of the United States, in company with the United States attorney at Kansas City, were present when the trunk was opened; and that it contained the morphine ordered to be forwarded.

[10, 11] Both these transactions clearly constituted a sale of the narcotics made in the city of New York. The rule is unquestioned that the delivery of goods to a carrier designated by the purchaser for transportation from the place of the seller to that of the purchaser is sufficient to pass the title in the goods—the goods being consigned in the name of the buyer in such a way as to confer on him the right to receive the goods from the carrier without reservation. When Brody shipped the 10 ounces by express from New York to Bernstein in Kansas City, and put the 40 ounces in a trunk and checked it to Kansas City, and the check was delivered to Bernstein and the money paid to Brody, the transaction was completed in New York City between the parties, and there remained nothing more to be done, and in each transaction the title then and there passed from Brody to Bernstein, and there was a complete change of possession. Grove v. Brien, 8 How. 429, 12 L. Ed. 1142; The Mary and Susan, 1 Wheat. 25, 4 L. Ed. 27; Tregelles v. Sewell, 7 Hurl. & N. 574; Browne v. Hare, 4 Hurl. & N. 822; Mitchell v. Baker, 208 Pa. 377, 57 A. 760; Scharff v. Meyer, 133 Mo. 428, 34 S. W. 858, 54 Am. St. Rep. 672; Smith v. Edwards, 29 Hun (N. Y.) 493.

In Hatch v. Oil Co., 100 U. S. 124, 135 (25 L. Ed. 554), the court said:

"Much discussion is certainly unnecessary to show that, where the terms of bargain and sale are in the usual form, an absolute delivery of the article sold vests the title in the purchaser, as the authorities upon the subject to that effect are numerous, unanimous, and decisive."

In the instant case the agreement of the parties was that Brody should make delivery in the one case to the express company and in the other case to the railroad company. This he was to do and did do in New York City, and when he did it he had done all that he was expected to do, and the transaction was completed as between the parties.

In the earlier cases it seems to have been assumed in contracts of sales that all agreements were intended to be cash sales, and that the property did not pass from the seller to the buyer until payment was made. In his work on Sales, Professor Williston

states that "the law is now well settled in accordance with the rule of the Sales Act, both where that act is in force and under the common law, that the property is presumed to pass when the contract is made, if the goods are identified, and nothing remains to be done other than delivery of the goods and payment of the price. A word of warning is necessary, however, in regard to cash sales, so called, where the property does not pass until payment of the price unless the condition is waived." 1 Williston on Sales (2d Ed.) § 264, p. 529.

The Sales Act in section 18 provides that:

"Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred."

And section 19, prescribing rules for ascertaining intention, declares: "Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer.

"Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed."

And rule 4 is as follows:

"(1) Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer. Such assent may be expressed or implied, and may be given either before or after the appropriation is made. (2) *Where, in pursuance of a contract to sell, the seller delivers the goods to the buyer, or to a carrier or other bailee (whether named by the buyer or not) for the purpose of transmission to or holding for the buyer, he is presumed to have unconditionally appropriated the goods to the contract,* except in the cases provided for in the next rule and in section 20."

The facts in this case do not bring it within the exceptions. The Sales Act was adopted in New York in 1911. Laws 1911, c. 571.

[12] In this case we have seen that the government did not rest upon the probative force of the indictment, but availed itself of its

right to offer testimony in support thereof. Its right to do so was not challenged and had it been the challenge could not have been sustained. Greene v. Henkel, 183 U. S. 249, 260, 22 S. Ct. 218, 46 L. Ed. 177.

[13] Brody introduced no testimony and the record presents no conflict of evidence from which different conclusions or inferences might be drawn respecting his guilt or innocence. The sales having been completed in New York, they never were made in Kansas City, Missouri, and the whole indictment being based on the theory that the sales were made in Missouri, and that Brody was in possession of the morphine in that state, it is clearly apparent that Brody could not be indicted in the district of Missouri for the acts he is shown to have committed in the state of New York as disclosed by the government's own witnesses.

The record fails to disclose that there is probable cause to believe that Brody committed in the state of Missouri the crimes charged against him in the indictment. Therefore no reason exists which justifies his removal from the Southern district of New York, where the criminal acts were committed, to the district of Missouri, in which district the evidence relied upon by the government shows they were not committed.

The order sustaining the writ of habeas corpus is affirmed.